# Richmond.

## TAYLOR v. TAYLOR.

### March 16, 1905.

Absent, Cardwell, J.

1. HUSBAND AND WIFE—*Custody of Infant Children—Case at Bar.*—In controversies between parents over the custody of their infant children, the supreme and paramount consideration is the welfare of the children. While the father is the natural guardian of his infant, and has a paramount right to their custody, this right is not absolute and unconditional like the right of property, and the widest discretion rests in the court, whether at common law or in chancery, to do what is best for the welfare of the children. The evidence in this case fully establishes the ability of the father, morally, financially and in every way to tenderly care for and raise his children, and his paramount right to their custody, and the welfare of those children, both demand that they should be restored to his control.

Error to a judgment of the Circuit Court of Norfolk county, on a proceeding by *habeas corpus*, wherein the plaintiff in error was the petitioner, and the defendant in error was the respondent.

*Reversed.*

The opinion states the case.

*G. S. Kendall* and *John T. Daniel*, for the plaintiff in error.

*James F. Duncan*, for the defendant in error.

HARRISON, J., delivered the opinion of the court.

This is a proceeding by writ of habeas corpus, wherein the plaintiff in error, A. Thomas Taylor, was the petitioner, and the defendant in error, his wife, Sallie L. Taylor, was respondent.

The object of the petition was to recover the possession of his two infant children who were in the custody of their mother, the respondent.

The writ was awarded, but on the hearing the lower court refused the prayer of the petition and dismissed the proceeding. This action of the Circuit Court is now before us for review.

It appears that the petitioner and respondent were married on the 18th of April, 1900; the former being twenty-one years old, and the latter only seventeen. The fruit of this marriage was two children—William Thomas, who at the time this proceeding began was two years and three or four months old, and Ella Charlotte, then an infant three months of age. The petitioner resides in the town of Cape Charles, where he has provided himself and family with a comfortable home, nicely furnished, which he owns in fee simple and free from encumbrance. The petitioner alleges that he is the proprietor of a prosperous and successful business that has enabled him to provide his wife and children with a comfortable living; that his personal habits are decorous and business like, being strictly temperate, industrious and thrifty; and that he has been at all times to the respondent a provident, loyal and affectionate husband, providing for her and his children amply, punctually, and most cheerfully; that, not content to enjoy the pleasures and comforts of her home, respondent had, without cause, excuse, complaint, or warning, stealthily deserted petitioner, taking with her the two children of their marriage, and established herself with her brother, Norman D. Rooks, whose last known address

was Huntersville, a suburb of the city of Norfolk. It is further alleged that Norman D. Rooks owned no property, and was without means except what he derived as a wage-earner, which was hardly sufficient to support himself and an aged mother who was dependent upon him; that respondent has no separate estate whatever, and is not only without means, destitute, and helpless, but is powerless to provide common necessaries for herself or children, and must therefore receive such provision from those upon whom the obligation of providing does not rest, or endure privation and hardship which her children neither invoked nor deserved to suffer. Petitioner further alleges that, after the departure of his wife, he went in a day or two to see her in person, and entreated her to return with him to their home, which she refused to do; that in two or three weeks thereafter he renewed this invitation through his counsel, but without avail; that then, as well as now, petitioner was, and still is, able, willing, and anxious to furnish his wife and children a home in the town of Cape Charles, and all such comforts as should make them reasonably contented and happy therein; that it is an insufferable tax upon his sensibilities to realize the status of his loved ones, being denied a competency save by the uncertain and, at best, temporary grace of those whose officiousness must sooner or later cease to actuate even the present measure of their charity, and that by the indiscretion of respondent, and in violation of petitioner's most sacred rights. Petitioner charges that his children are being illegally detained in the custody of respondent; that their best interests demand that they be delivered to and reared under the care of petitioner; that he is in every way prepared to provide them with appropriate and tender care; that if delivered into his custody they will be cared for and ministered to by his mother, who is exceptionally devoted to her grandchildren, and that every necessity will be provided for them during his lifetime,

and after, as he carries sufficient life insurance in solvent institutions to raise said children in reasonably luxury, if properly administered.

The essential allegations of this petition are supported by evidence other than that of the petitioner. Indeed, it would be difficult for any one to establish by those who have known him from childhood a higher character or better reputation than is accorded the petitioner by those who speak in his behalf in this case.

Lemuel E. Mumford, a banker at Cape Charles, says: "I have known petitioner from his boyhood; I know his general reputation in the community in which we both live, and have no hesitation in pronouncing it to be good." He further says that petitioner is industrious, thoroughly sober, steady, progressive, and prosperous, as well as amiable in disposition; that as far as ascertainable from outside appearances, petitioner is a comfortable liver in his home, and owns a very cozy residence in Cape Charles, where he and his family lived prior to Mrs. Taylor's departure from him, and has a business in town that appears, and is generally believed, to be prosperous and successful; that affiant believes, in common with petitioner's neighbors generally, that he is thoroughly worth of belief and truthful in all that he may state; that affiant is aware of no reason why petitioner is not a suitable person, amply qualified in every way for the custody and management of his children.

Marion H. Stevenson, the mayor of the town of Cape Charles, says: "I am thoroughly acquainted with the general reputation of petitioner in the community in which we both live, and have no hesitation in pronouncing it first class in every particular. Petitioner is of excellent personal character, sober, industrious, honest, honorable, and amiable. I know of no young man in the town of Cape Charles, or anywhere, more trustworthy, in every way, nor one who is better qualified

as the head of a small family such as he had up to the departure a few months ago of his wife"; that petitioner is the proprietor of a prosperous business in the town, owns a comfortable home, and that affiant is aware of no reason whatever why petitioner is not in every way a suitable person to have the custody of his children.

E. J. Twiford, a grocery merchant, after speaking in the highest terms of the character and reputation of petitioner, says that he is comfortably fixed for housekeeping, has a paying business, and is a good manager, and excellent provider for his family, or was before his wife broke it up by leaving him, if affiant may judge from the amount and quality of the provisions bought at his store by the petitioner and his wife, where both had unlimited credit, as petitioner never questioned or refused to pay a bill promptly, whether bought by his wife or their servant.

A number of other merchants and business men of Cape Charles testify in the most flattering terms to the high standing and character of petitioner, and to his entire qualification in every respect to raise and train his children; but it would unnecessarily prolong this opinion to quote further from this evidence. We have only desired to convey some idea of the character in which the petitioner has presented himself to this court, claiming the right to the custody and care of his children.

The petition, from which we have quoted quite fully, was answered by respondent briefly as follows: "That respondent does not unlawfully detain the bodies of the two infants named in the complaint; that on account of the harsh and cruel treatment of respondent by petitioner she was forced to leave his bed and house and seek refuge with her brother, where she is now domiciled with her infant children; and that she alone is the proper guardian of her children, and is able to support and take care of them." The only suggestion in this answer point-

ing to any justification for respondent's conduct in abandoning her husband's house and taking off his children, is the general charge that she left on account of harsh and cruel treatment by petitioner. There is no specification of time, place, or circumstance, when she was harshly or cruelly treated. The only evidence offered in support of the charge is a brief statement by respondent as a witness in her own behalf. This testimony is as follows:

"I left Mr. Taylor because he made my life so unpleasant and disagreeable that I was afraid to continue to live with him. He was very jealous and accused me of unchasity; said that the youngest child, Ella Charlotte, was not his child; that on July 3, 1902, he insisted upon taking the baby out of its carriage, when she objected, and that she struck him in the face with her hand and he kicked her; that on the same day when they got home Mr. Taylor locked her out, and she had to return and spend the night with her brother, George Rooks; that on the 4th of July, 1903, he did not get home in time for his supper; that when he came back he was in a bad humor, quarrelled with her, and said something about shooting, and that she ran over to a neighbor's, and came back in a short time to see if she could get in, and Mr. Taylor opened the door and she spent the night at home; that his treatment of her during the ensuing time until she left was of a nature that she could not stand; that she was very unhappy and determined to leave him."

The only other evidence adduced by respondent is the bare statement of her sister-in-law, Mrs. Rooks, that she corroborates the statement of respondent with respect to the quarrel which took place over the baby when it was taken from the carriage; and the statement of Norman D. Rooks, with whom respondent was lodged, who said that he had no position at that time; that he had given up a place in Philadelphia to look out for his sister; that as soon as this matter was settled he

would return to Philadelphia, where his brother lived, and that they would look out for his sister and her children, and support them; that his sister was without property, and he only had what he worked for, but was willing to support his sister and her children.

The petitioner testifies that when he returned to his home on the evening of November 7, 1903, he was shocked to find his wife and children gone; that he had given her no cause to leave him; that he was making arrangements to enlarge his business operations in order that he might make more money with which to make his family comfortable and happy, that being the one object of his life; that the children in question are undoubtedly his; that he never thought respondent unchaste in the slightest, and can only account for her statement to that effect upon the idea that she has distorted some jesting remark into a meaning that was never intended. It may be remarked in this connection that a man with the character and reputation sustained by the petitioner, as shown by this record, would hardly be prosecuting a proceeding to recover from a mother children born in lawful wedlock, the paternity of which he had denied; nor would he be entreating a wife that he thought unchaste to return to his home to be restored to the sacred relation established by their matrimonial vows. The petitioner explains the charge that he kicked respondent as follows: He says that he lifted the baby from the carriage, against her objection, because it was crying; that when she struck him across the face with her hand both of his hands were engaged in holding the baby, and he pushed her from him with his foot. Petitioner says that he never locked his wife out of their house on the occasion mentioned by her; that they had returned to their home accompanied by Mrs. George Rooks, the wife of a half brother of respondent; that when they reached home Mrs. Rooks asked his wife to return with her

and spend the night, as she would be alone; that petitioner consented, which is, he says, the explanation of his going in the house and locking the door; that it was all done at the request of Mrs. Rooks and respondent. It will be observed in this connection that Mrs. Rooks, who was present, is not brought forward to sustain respondent in her charge that she was locked out, and it will be further observed that respondent lived in her husband's home for sixteen months after the occurrence of the two last-mentioned circumstances, contented and happily, so far as her neighbors knew, or had any reason to believe.

The only other specification made by respondent tending to show cruelty or harsh treatment is that she was frightened out of the house in her night-clothes, and fled to a neighbor's house, by petitioner being in a bad humor and saying something about shooting. Petitioner says that on the occasion mentioned he came in a little late, having been detained by his business; that he encountered a crowd of negroes on the sidewalk in front of a negro hall, one of whom insulted him and followed him to his yard gate; that he went in the house, mentioned the circumstance to his wife, who had retired, took out his pistol, saying that if that negro came in the yard he would shoot him; that he felt like going out and driving him away anyhow; that respondent became frightened and ran to a neighbor's and was given a room there; that he went over and got respondent and brought her back home. Mr. Grimmer, the neighbor, to whose house respondent fled, says that he lives two doors from the house of petitioner; that he was aware of no unpleasantness in the family circle; that on the night of July 4, 1902, about ten o'clock, respondent came to his house with her baby and he gave her a room; that he started to see petitioner and ascertain the trouble, and met him at affiant's door coming for his wife; that petitioner did not appear to be mad, was not rude or boisterous in his manner, but was perfectly sober and mild man-

nered; that at his request respondent returned with him; that petitioner asked her reasons for leaving in the way she did, and that she could give none, simply saying that petitioner was talking something about shooting; that he did not threaten to shoot her at all, but was talking about shooting, and this is all affiant could learn as to the cause of her leaving the house that night. This witness also testifies to the high character of the petitioner.

We have taken the trouble to state fully the entire evidence in this case because its recital seems to be a sufficient vindication of the conclusion which, under the law, is inevitable.

The law applicable to this class of cases is well settled, and what has been so often and so well said by others need not be repeated here to any large extent.

The father is the natural guardian of his infant children, and has a paramount right to their custody, but the right to the custody of his children is not like the right of property, an absolute and unconditional right. It is now too well settled to call for citation of authority that in this class of cases the widest discretion rests in the court, whether at common law or in chancery (Hurd on Habeas Corpus, pp. 455-6-7), and that the supreme and paramount consideration in all cases is the welfare of the child or children involved in the controversy. However pure and upright the father may be, and able financially to provide for his child, circumstances may exist that would imperatively demand a denial of the father's right, and a continuance of the child with the mother.

It is said in Hurd on Habeas Corpus, that the question of custody between the conflicting claims of parents, being one of discretion rather than one of strict law, the duty of determining it is not only important in all cases, but in some exceedingly delicate and embarrassing. The welfare of the child being the paramount object to be secured, attention to many circum-

stances is required, such as its sex, age, health and social position as affected by its parents; its expectations of property from them or either of them; the state of its morals and education; and the surest means, under the circumstances, of securing for it that discipline and instruction necessary to qualify it for that station in life it would reasonably have been expected to fill had no controversy arisen. The comparative qualifications, also, of the parents to provide for these various wants require consideration, such as temper, morals, habits, judgment, etc. It cannot be otherwise than that there should be some diversity of opinion upon such questions addressed to the discretion of a court; and that the conclusion reached will be to some extent colored by the experience and observation of the individual who exercises the discretion. As has been well said, however, "it will be no disqualification to the judge, if from that experience he can testify, upon the one hand, how precious is the devoted mother's love, how vigilant and how self-sacrificing her care; and upon the other, how salutary is the loving father's correcting hand, how disinterested and wise his ever ready counsel, and how instructive his own consistent life." Hurd on Habeas Corpus, pp. 462 *et seq.;* Church on Habeas Corpus, ss. 438 *et seq.; Slater* v. *Slater,* 90 Va. 845, 20 S. E. 780; *Carr* v. *Carr,* 22 Gratt. 307; *Stringfellow* v. *Sommerville,* 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623.

In the light of the authorities cited, the conclusion in the case at bar, though painful, is comparatively free from difficulty. The record will be searched in vain for a plausible reason, much less one deemed sufficient in law, for the conduct of this young wife and mother in abandoning her home and taking away the children born to herself and husband. The ability of the father, morally, financially, and in every way to tenderly care for and raise his children is fully established, while the mother is absolutely without means, without excuse, and in

violation of her husband's rights has sought a precarious refuge for herself and children, with a brother who admits that he is dependent upon his daily earnings for support, who is out of employment at the time he testifies, and only expects to secure employment in a distant city when this controversy is settled.

Not a voice is raised to say one word as to the fitness of respondent to have the care and management of these children, while her conduct in abandoning her husband and home proclaims in the strongest terms her lack of judgment and good feeling, to say the least. There can be no doubt that the respondent has lightly abandoned duties which every consideration of religion, morals, and the laws of society bound her conscientiously to perform. Under all the facts and circumstances of the case, there can scarcely be but one opinion, which is that the paramount right of the father to the custody of his children, and the welfare of those children, both demand that they should be restored to his control.

Cases like this excite only regret that a home has been unnecessarily broken up, and its inmates scattered; sympathy for the helpless little children, who are, without fault, deprived of the blessing of a home where love and happiness abound; and sorrow that those who have vowed to love, honor and cherish each other should be estranged, apparently without cause. This record discloses no reason why these parties should not be reunited and lead prosperous and happy lives. It is earnestly hoped that reflection will satisfy the respondent that her own happiness, and, above all, the welfare of her children, imperatively demand that she should accept her husband's invitation, and return to the comforts and protection of his home.

With the view, therefore, of bringing about this greatly to be desired reconciliation, the case will be remanded to the Circuit Court, with directions that an order be entered there requiring respondent to forthwith produce the body of the older child,

William Thomas, before the court, and to promptly deliver him to the petitioner. And as to the younger child, Ella Charlotte, the case will be continued on the docket for the period of six months; and if, within that time, the respondent shall voluntarily return to the home, and the bed and board of petitioner with the child, Ella Charlotte, such act on her part shall be regarded as a full compliance with her obligation in the premises, and an order will, in that event, be entered dismissing the case. But if, after the end of the six months, the respondent has not voluntarily returned with the child, Ella Charlotte, to the home and bed and board of the petitioner, then an order shall be entered by the Circuit Court requiring the prompt and immediate delivery of such child if the petitioner shall desire it.

For these reasons, the judgment of the Circuit Court must be reversed, and the case remanded for further proceedings in accordance with this opinion.

*Reversed.*