𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

WYATT AND ANOTHER V. GLEASON.

January 12, 1915.

Absent, Keith, P.

1. PARENT AND CHILD—*Custody of Child—Foster Parents—Welfare of Child.*—Ordinarily a father is entitled to the custody of his infant child, but the court will exercise its discretion according to the facts, and continue what will be best calculated to promote the child's welfare; and especially is this true in cases where the father has voluntarily relinquished the custody of his infant child to a suitable female relative in whose care the child has grown and expanded, and warm ties of affection and love have sprung up between it and its foster parents. In such cases the welfare of the child is the prime consideration in determining the controversy. In the case at bar, the foster parents are people of the highest moral character, not rich, but of sufficient means to maintain a comfortable Christian home. They have been in the highest sense father and mother to her. The child is happy and contented, and all of her environments are suitable and safe, and her future welfare seems assured. To change the custody to that of the father would be, at best, experimental, and the welfare of the child seems clearly to demand that the change should not be made.

Error to a judgment of the Corporation Court of the city of Lynchburg on a writ of *habeas corpus.* Judgment for the petitioner. Defendants assign error.

*Reversed.*

The opinion states the case.

*Jno. L. Lee,* for the plaintiffs in error.

*Coleman, Easley & Coleman,* for the defendant in error.

HARRISON, J., delivered the opinion of the court.

This proceeding was instituted by the defendant in error to recover of the plaintiffs in error an infant child, and resulted in the order appealed from in favor of the right of the defendant in error to the custody of the person of such infant.

It appears from the record that R. T. Gleason, the defendant in error, was married in July, 1907, and that in October, 1911, his first and only child, a girl named Nellie, was born to him. Two weeks after its birth the mother of this infant died. She had been very ill from the beginning of her confinement—so ill that her baby was put in the care of a Mrs. Hodges who was then nursing an infant of her own. Mrs. Bessie May Wyatt, one of the plaintiffs in error, was continuously with her sister, Mrs. Gleason, throughout her illness, and when the dying mother realized that her child would soon be motherless, she besought her sister to take little Nellie and raise her and be a mother to her, and this Mrs. Wyatt promised her to do. A day or two after Mrs. Gleason's death the plaintiffs in error, Mrs. Wyatt and her husband, who had been married for some years but were childless, had a talk with Mr. Gleason about the child. They both told him that they wanted and would love to have the little one, and would care for it most tenderly, but that realizing how it would entwine itself around their hearts, they were unwilling to take it except upon the terms that they be permitted to keep and rear it. At this conference Mr. Gleason declined to assent to the proposed arrangement, and the child was left with Mrs. Hodges. Within a few days after the conference mentioned, Mr. Gleason requested Mrs. Wyatt, over the telephone, to come to his place of business. She went at once and he told her

that he was not satisfied with the condition that little Nellie was in; that she was sick and apparently not cared for, and requested Mrs. Wyatt to take her. This she did at once, finding the little thing in a most distressing and critical condition as the result of neglect. We think this record justifies the conclusion that but for her timely interposition and motherly care this little child would not now be the subject of this controversy.

In May, 1913, the defendant in error was married again to a young lady sixteen years of age, and in September of the same year, when the child was nearly two years old, this *habeas corpus* proceeding was begun.

The record abundantly shows that the plaintiffs in error, Mr. and Mrs. Wyatt, are people of the highest moral character, not rich, but with sufficient means to maintain a comfortable Christian home, where this child of their deepest love not only can, but will, so far as human foresight can tell, be tenderly cared for; that her foster-parents are not only fit and proper persons to raise and provide for her, but are in the highest sense mother and father to her; that she is well cared for physically and morally, and is happy and contented in the love of the only mother and father she has ever known, and that she could have no more suitable home. This is the picture the record presents of the situation and surroundings of this little girl; whereas, it is silent as to the character and fitness of the father and his girl wife. The only witnesses who have testified as to Mr. Gleason's character are four of his business acquaintances, who speak almost wholly as to his business integrity and ability. They do not appear to have ever seen him in his home or to know anything of his domestic habits. There is not a whisper in the record as to the fitness of his young wife who will have, in the nature of things, almost exclusive dominion over the child, should she be taken from her present happy home, where her childless aunt lavishes upon

her a mother's love. The evidence tends strongly to show that the defendant in error has manifested little or no interest in his child since she was placed, when two or three weeks old, in the arms of her mother's sister. He has bestowed upon it, apparently, no affection and has paid it none of those little attentions which are naturally to be expected from a father.

Ordinarily, the father is entitled to the custody of his infant child, but it is now well settled that in a controversy over the custody of a child, the court will exercise its discretion according to the facts and continue what will be best calculated to promote the child's welfare; and especially is this true in cases where the father has voluntarily relinquished the custody of his infant to a suitable female relative, in whose care the child has grown and expanded, and warm ties of affection and love have sprung up between it and its foster parents. In such cases the welfare of the child is the prime consideration in determining the controversy. *Merritt* v. *Swimley*, 82 Va. 433, 3 Am. St. Rep. 115; *Coffee and wife* v. *Black*, 82 Va. 567; *Stringfellow* v. *Somerville*, 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623; *Meyer* v. *Meyer*, 100 Va. 228, 40 S. E. 1038; *Taylor* v. *Taylor*, 103 Va. 750, 50 S. E. 273.

We are of opinion that under the evidence in the case before us, the conclusion cannot be escaped that it would be an unwise exercise of judicial discretion to take this little girl from her present happy surroundings where she has lavished upon her the devoted love of her mother's sister, and turn her over to those who are strangers, at least to her. All of her environments are suitable and safe and her future welfare seems assured. The proposed change would be, at best, but an experiment, which does not, from the evidence, appear to promise a better life. It is a case where, in the interest of the child's welfare, it is clearly best to let well enough alone.

We are further of opinion that the weight of the evidence shows that the relinquishment of this infant to its mother's sister was the voluntary act of the father, with the tacit, if not expressed, understanding that his sister-in-law was to keep the child and raise it. By his own acquiescence he has allowed the affection on both sides to become engaged in a manner that he could not fail to have anticipated. He has permitted a state of things to arise which cannot be altered without risking the welfare and happiness of the child. *Coffee and wife* v. *Black, supra; Stringfellow* v. *Somerville, supra.*

For these reasons, the judgment complained of must be reversed and set aside, and this court will enter such judgment as the lower court should have entered, dismissing this *habeas corpus* proceeding with costs.

*Reversed.*