# Richmond

WALTER RUSSELL BURTON AND GRACE E. BURTON v.
DAVID DIXON RUSSELL.

January 16, 1950.

Record No. 3553.

Present, All the Justices.

The opinion states the case.

*William Old*, for the plaintiffs in error.

*Rooke & Merhige*, for the defendant in error.

GREGORY, J., delivered the opinion of the court.

This proceeding was instituted by David Dixon Russell for the purpose of obtaining the custody of his infant son who had been turned over to Mr. and Mrs. Burton by its mother. The son is now seven years old, but at the time of this proceeding was six years of age. The court granted

the prayer of the *habeas corpus* petition and awarded the custody of the said infant to his father, and Mr. and Mrs. Burton obtained the present writ of error.

David Dixon Russell and Mildred Rachel Russell were married on August 30, 1940, in the city of Baltimore, Maryland. They lived together for some two years, moving from one place to another. He did not have steady employment, and according to her, he drank heavily and was unstable. This he denied.

On July 12, 1942, David Dixon Russell, Jr. was born. Six weeks after his birth the mother was forced to leave her husband in Baltimore and return to Virginia where she lived with her stepfather in Fredericksburg. The father was inducted into the U. S. Army in October, 1942, and some five months later allotments of $80 per month were received by the wife. These allotments, which were not shown to have been voluntary, continued until his discharge from the army in November, 1945.

Mrs. Russell found it impossible to live on the allotments which she received and was forced to seek employment. She removed to Richmond in the early part of 1944, and was employed by the DuPont Company. She was unable to hold her job and look after the child at the same time, so she approached the personnel officer of the company in regard to the matter and was told that a Mrs. Rogers would be a satisfactory person with whom to leave the child. Arrangements were made with Mrs. Rogers to take care of the child, Mrs. Russell agreeing to pay her $9 a week for that service, and also agreeing to provide the necessary clothing.

The husband of Mrs. Rogers, who was also an employee of the DuPont Company, was transferred to Wilmington, Delaware, and Mrs. Rogers accompanied him. This made it necessary for Mrs. Russell to seek another person to take care of the child. Mrs. Burton, who was a sister of Mrs. Rogers, and her husband, agreed to continue the arrangement that Mrs. Russell had with Mrs. Rogers.

Sometime in the autumn of 1945 Mrs. Russell instituted divorce proceedings against her husband in the Hustings Court of the City of Richmond, Part II, and in December, 1945, while the proceedings were pending, Russell was discharged from the army and returned to Baltimore where he resided with his mother. About the middle of December, 1945, he came to the home of Mr. and Mrs. Burton in Chester, Virginia, to see the child, and carried the child to Baltimore for Christmas, and in about a week returned it to Mr. and Mrs. Burton. He did not then object to the child being with the Burtons. He knew of the pendency of the divorce suit but made no appearance. On January 26, 1946, the court granted Mrs. Russell a divorce *a vinculo* from her husband on the grounds of desertion and abandonment. In the same decree the custody of the child, which is the subject of the present litigation, was awarded Mrs. Russell. At that time the child was living with Mr. and Mrs. Burton, who continued to care for it as their own. They loved the child and the child had grown to love them. Russell knew that the $9 per week paid Mr. and Mrs. Burton was being paid by his former wife. Excepting the allotments made to his wife for approximately two and one-half years while he was in the army, he has not contributed any funds to the support of his child during its entire life.

In the early part of 1943 the child became ill with pneumonia and its life was despaired of. Mrs. Russell, being without funds, was forced to seek the aid of the American Red Cross in order to secure adequate medical attention for her son. Her husband came to see the child while he was ill but made no arrangements to help take care of the expense that was made necessary by the child's illness.

Mrs. Russell has remarried and is now Mrs. Mildred Rachel Steris, residing with her husband in Lorraine, Ohio. She continued the $9 weekly payments to the Burtons until July, 1947, at which time they ceased. At that time Mr. and Mrs. Burton indicated to her their desire to adopt the child, and said that unless they could have him permanently

they did not care to continue looking after him. Mrs. Steris concurred in this thought and signed a paper consenting to the adoption, but the adoption proceeding was never completed. The Burtons tried to communicate with the father and have him consent to the adoption. They addressed communications to him in Florida which were returned. They continued to keep the child as their own and are now sending him to school.

There can be no question about the fitness of the Burtons to rear this child. They have a nice home and have grown attached to him. They produced witnesses of high standing in the community of Chester who testified as to their character, reputation and general fitness to rear the child. It is true that Russell and his present wife testified as to his fitness to rear the child, but when his testimony is considered in the light of his failure to contribute any funds to the child's support and maintenance during its entire life, other than the allotments which came through the government, his testimony is greatly weakened if not entirely destroyed.

As previously stated, the custody of the child was awarded its mother by the divorce decree of January 26, 1946. Russell filed a motion in the court below under Code, section 5111, to amend the decree to the extent that the custody of the child be awarded him. The former Mrs. Russell was made a party defendant. The Burtons were not parties to this proceeding. Mrs. Steris (formerly Mrs. Russell), according to her testimony, did not have the necessary finances to attend and testify in that proceeding. The Burtons, in compliance with the court's order, brought the child to the court on October 9, 1948, and on that date the court transferred the custody of the child from Mrs. Steris to the father, David Dixon Russell. He thereupon made demand upon the Burtons to deliver possession of the child to him. He intended to take the child to Florida, beyond the jurisdiction of the court. The Burtons refused to comply with this demand and, on October 11, 1948, Russell filed this

petition for a writ of *habeas corpus*, praying that the Burtons be commanded to bring the body of David Dixon Russell, Jr. to court. The petition for the writ was founded entirely upon the order of October 9, 1948, entered in the divorce suit, changing the custody of the child from the mother to the father. The petition contained no allegation that the best interests of the child would be advanced by taking him from the custody of the Burtons and turning him over to Russell to be taken to Florida.

The Burtons appeared and filed a demurrer to the petition for *habeas corpus.* It was overruled and then they filed their answer. Thereupon, Russell introduced a certified copy of the decree of October 9, 1948, which was entered in the divorce suit, and to which the Burtons were not parties, and rested. The Burtons then move to strike the evidence and their motion was overruled. The evidence was heard *ore tenus,* and the court entered the judgment of the *habeas corpus* proceeding, which is now the subject of this review.

There are three assignments of error, but we do not deem it necessary to discuss them separately. It must be remembered that Russell stands in this court with a judgment in his favor, based upon testimony given before the trial court *ore tenus,* the effect of which is to place him in a superior position so far as this litigation is concerned.

However, it must also be remembered that in matters of this kind courts exercise equity jurisdiction and possess a discretion, according to the facts, to do that which is best calculated to promote the child's welfare. This is of prime consideration in determining controversies of this kind.

This case, in our opinion, is controlled by *Wyatt* v. *Gleason,* 117 Va. 196, 83 S. E. 1069. There, the contest was between a natural parent and third parties who had the custody of the child. The court, in permitting the child to remain with its foster parents, had this to say: "Ordinarily the father is entitled to the custody of his infant child, but it is now well settled that in a controversy over the custody of a child, the court will exercise its discretion ac-

cording to the facts and continue what will be best calculated to promote the child's welfare; and especially is this true in cases where the father has voluntarily relinquished the custody of his infant to a suitable female relative, in whose care the child has grown and expanded, and warm ties of affection and love have sprung up between it and its foster parents. In such cases the welfare of the child is the prime consideration in determining the controversy. *Merritt* v. *Swimley*, 82 Va. 433, 3 Am. St. Rep. 115; *Coffee and Wife* v. *Black*, 82 Va. 567; *Stringfellow* v. *Somerville*, 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623; *Meyer* v. *Meyer*, 100 Va. 228, 40 S. E. 1038; *Taylor* v. *Taylor*, 103 Va. 750, 50 S. E. 273.

"We are of opinion that under the evidence in the case before us, the conclusion cannot be escaped that it would be an unwise exercise of judicial discretion to take this little girl from her present happy surroundings where she has lavished upon her the devoted love of her mother's sister, and turn her over to those who are strangers, at least to her. All of her environments are suitable and safe and her future welfare seems assured. The proposed change would be, at best, but an experiment, which does not, from the evidence, appear to promise a better life. It is a case where, in the interest of the child's welfare, it is clearly best to let well enough alone."

The rule is reiterated in *Fleshood* v. *Fleshood*, 144 Va. 767, 130 S. E. 648.

In *Markley* v. *Markley*, 145 Va. 596, 134 S. E. 536, this court held that the ancient rule that the father, when a proper person, is always entitled to the custody of his infant child, has been modified by numerous decisions of this court. It has also been modified by Code, 1942 (Michie), section 5320. There, the statute provides that as between parents there shall be no presumption of law in favor of either parent. In the *Markley Case* the court emphasized the fact that where the child is incapable, because of infancy, of exercising its own judgment, the court will exercise its discretion according to the facts and arrive at its own con-

clusion as to what will be best calculated to promote the interests of the child, having due regard to the legal rights of the party claiming the custody.

In *Surber* v. *Bridges*, 159 Va. 329, 165 S. E. 508, the court held that a father who has done nothing to forfeit his rights and who is a man of good character, possessed of a decent home, should not be deprived of his children, "even by a Croesus or an Archbishop of Canterbury, and this holds though he be poor as a pagan * * *". But the court there held that the child's welfare was paramount and refused to grant custody to the father. The guiding principle in all of these cases is the welfare of the infant.

The Georgia court recently decided a case which in most respects is so similar to the one at bar that we think it helpful to refer to it. The case is *Camp* v. *Bookman* (1949), 204 Ga. 670, 51 S. E. (2d) 391. There, the father relinquished all of his rights to the child to third parties. He was shown to be unfit to have its custody. The mother's character and her ability to rear the child had been questioned. The father and mother were divorced and both had remarried. The fitness of the third parties to whom the child had been given by the father to rear and educate was not questioned. They were of excellent character and financially able to carry out the obligations in connection with the child. The trial court decided that the welfare of the child would be best served by awarding the custody to them.

On appeal, the Supreme Court of Georgia affirmed the judgment of the trial court and applied the Georgia law which is quite similar to ours. It held that in *habeas corpus* proceedings the court has the discretion as to the possession of the child, looking solely to its interest and welfare, but that the discretion must not be arbitrary. It should be exercised and governed in accordance with the rules of law, and should be in favor of the party having the legal right unless the evidence shows that the interest and welfare of the child justify overriding the rights of the person holding the legal claim. In that case it was held that the welfare

of the child required it to be separated from its natural parents and turned over to third parties who are shown to be fit and proper persons to have its custody.

The record in this case does not support the judgment of the court as a matter of law. The only evidence in chief for the father is the decree of October 9, 1948, entered in the divorce suit, which adjudicated the custody as between the father and mother. It was placed with the father. That this decree is only *prima facie* evidence in the present *habeas corpus* proceeding is conceded. The father cared so little for the child that he failed to appear in the divorce suit and ask for the custody of the child or offer to pay for its maintenance, even though he had actual knowledge of the divorce action. According to his own testimony in rebuttal, his conduct over the years of his married life places him in a very poor light. For three years he knew the Burtons had the child and he made no contribution to them for its support and made no objection to the arrangement. He impliedly consented to it.

Russell knew that his child was critically ill with pneumonia at one time and that he was badly in need of medical attention and hospitalization. He failed to provide it. He permitted the child to accept the charity of the American Red Cross which provided the necessary hospitalization. He failed to offer to help in any way. He has never paid any bills for the child or supplied any funds for his support during the child's life, except the allotments which came through the government for two and one-half years. Even now he continues in his failure to provide any funds for his son's support. That he has manifested slight or no interest in him is clear. It is true he has sent him a few toys at Christmas time and on birthdays, but on his way from Florida to Baltimore he passed through the town of Chester, Virginia, where the child is, and returned, without seeing him. As an excuse he said no one was at home when he passed through on either trip. He left no word or note with anyone there that he would return and that he desired to see his son. If

he can, he intends to take the child to Florida to live in surroundings strange to the child, and with those who are strangers to him. This would be, in our opinion, a dangerous experiment for the child. He would be beyond the jurisdiction of Virginia courts, in the hands of those who have never before given him any love or manifested any real interest in his behalf.

We must, in deciding a case of this kind, take a comprehensive and broad view of the entire situation. No technical or restrictive view, which would not promote the best interests of the infant, should be adopted. This case is controlled by rules of equity. We find that the mother now has released her claims to the child to the Burtons, and has signed adoption papers in their favor. It was adjudicated in the divorce decree of January 26, 1946, that the father had abandoned and deserted his wife and child. In addition to that, he has lived with the child only six weeks in its seven years of life. His own testimony discloses that he has in fact abandoned and neglected him. So we have a case in which it might be concluded that neither of the natural parents should have the custody of the child. The decision of this case rested in the sound judicial discretion of the trial court. That court evidently exercised an erroneous discretion, based on a misconception of the facts.

In Florida the father has lived in a trailer, and has had three jobs since he went there on January 1, 1947. It is true that he now has purchased a home for some $9,000, on which he has paid $800. His second wife, a young woman, agrees that she will care for the child and rear it, but from the testimony it is disclosed that she has a full-time job, and if he has a full-time job, the child necessarily will have to be reared by someone else.

The judgment of the trial court is reversed, and the petition for the writ of *habeas corpus* is dismissed.

*Reversed and dismissed.*

SPRATLEY, J., dissenting.

I differ with my brethren of the majority with respect to the factual aspects of this case. The law is not in dispute. In stating the facts, the majority have, perhaps unconsciously, over-emphasized or magnified the circumstances supporting the claim of the appellants, and have overlooked pertinent and material evidence of facts and circumstances favoring the father of the child. The application of the law to the realities of the case appear to me to be in violation of established rules of appellate review.

Despite the fact that the majority opinion notes that the father comes before this court with a judgment in his favor, based upon *ore tenus* testimony given before the trial court, it sets out the facts in the light most favorable to the appellants and then concludes that the evidence does not support the judgment of the trial court as a *matter of law.* It seems to me that the question is one of *fact.*

The majority of the court has adopted a view based upon the facts as they evaluate them, and the trial judge a different view based upon the facts as he saw them. In such a case we have said time after time that the finding of a judge, who sees and hears the witnesses testify, is entitled to the greatest consideration, is usually accorded the full force of a jury's verdict, and should not be disturbed if supported by credible evidence.

In great deference to my associates, I submit that their statement of facts should be enlarged. Viewed in the light most favorable to Russell, the following circumstances are disclosed:

The mother of the child sued for divorce while the father was in the Army and overseas. At that time the mother had placed the child with the Burtons without the knowledge of the father. Upon the return of the father from service, he did not know the address of his wife or child. Immediately upon his discharge from the Army, he ascertained his child's whereabouts, and paid a visit to his

child, at the home of the Burtons. Over the objection of the Burtons, he took the child with him in December, 1945, for a week's visit to the home of his parents in Baltimore. He then had no home of his own, no occupation, and no one to look out for his son. Consequently, in January, 1946, he did not contest in the divorce suit the award of the custody of the infant, then less than four years of age, to the mother.

In adjustment of himself after the war, Russell set out to better his condition and to make a home for himself. He obtained one job, then another, each succeeding employment improving his condition. In one year and six months he had worked himself into employment where he earned more than $200 per month.

In August, 1947, he married again and in September of that year bought a house and established quarters for his family. In the meantime, he was located some distance from his son. He saw little of his child. He, however, remembered him on his birthdays and at Easter and Christmas with small presents. Until 1948, he was hardly in a position to properly provide for and take care of a young child, although he still held the hope of obtaining the custody, as evidenced by the fact that he refused to give his consent to the adoption of the child by the Burtons.

Russell did contribute to the support of his son during most of the time he was in the Army. Until December, 1945, the mother received $80 per month, out of which she says she expended $9 per week for the care of the child. She did obtain employment to assist in her support. So did thousands of other young women married to men in the service. In the period of Russell's adjustment, subsequent to January, 1946, he did not make proper provision for his child's support; but this may be excused to some extent by reason of his circumstances and by the fact that he knew the child was receiving proper attention from those with whom he was living. In not disturbing the possession

of the child during that period he manifestly regarded the best interest of his son.

In October, 1948, when Russell asked for and obtained a decree from a court of competent jurisdiction awarding him the custody of his son, his fitness to have such custody was a major concern of the court. The mother, at that time, authorized her attorney to represent to the court that she had no objection to such an award. In this proceeding of *habeas corpus*, where again he was found to be a fit and proper person, at the time of the hearing, to have the custody of his child, the main contention of the appellants was that they were better situated as to surroundings to give to the infant greater care and attention.

We are faced with a record which gives evidence that the father is ambitious and industrious, solicitous as to the welfare of his child, and is now so situated that he can provide fit and proper care for his son appropriate to his station in life. I would view with favor the successful effort of the father to rebuild his broken fortunes and assume the obligations created by law and good morals.

Every action of the father refutes the claim that he voluntarily relinquished the possession of his child to the Burtons. I agree that the Burtons are fit and proper persons to have the custody of a child, and I think that to deprive them of the custody of young Russell would result in a shock to their emotions. However, the testimony and actions of the Burtons show that they were volunteers. They took the risk of becoming fond of the child when they accepted his custody for compensation. It was long after their acceptance before their devotion developed to the extent that they asked for his adoption to prevent his return to either of his parents.

The right of a parent to the custody of his child is founded in nature and in wisdom. The ties of blood are counted as among the strongest of human emotions. In the consideration of the welfare of a child they cannot be disregarded when the parent is a fit and proper person to rear

his offspring. An infant son is entitled to the association and tender affection of his father as he grows into manhood. No stranger in blood can take the full place of the relationship created by nature. The embarrassment of an explanation of the absence of a parent presents a difficult situation to a young mind developing under the normal surroundings of family life. Therefore, I cannot subscribe to the view that where a father has been shown to be a fit and proper person he may be deprived of the natural right to the custody of his son because some other person may provide the child with better social and financial opportunities. If such a view be adopted, thousands of parents could be deprived of the custody of their offspring.

The facts and circumstances in *Wyatt* v. *Gleason,* 117 Va. 196, 83 S. E. 1069, and *Camp* v. *Bookman,* 204 Ga. 670, 51 S. E. (2d) 391, may be readily distinguished from those here.

In the *Wyatt Case,* the relinquishment of the infant to its mother's sister was a voluntary act of the father. In this case, at the time the child was placed in the custody of the Burtons, Russell was not advised of the transfer. As we have seen, he never acquiesced in any claim that the Burtons had a superior right to the custody of his son.

In the *Camp Case,* the father was shown to be unfit to have the custody of his child, and the mother's character and ability to rear the child had been questioned.

The facts and circumstances of this case present an old, old story. Without the wisdom of Solomon, it is difficult to find the correct answer. Our emotions sway us in one direction, and our minds and experience direct us in another. The able, learned and experienced trial judge was in a much better position to arrive at a proper conclusion. He saw and heard the witnesses testify, observed their attitude, demeanor and general conduct, and was thereby able to get a closer and more accurate picture and coloring of the entire situation than this court can receive from the cold, hard print of the record.

Considering all of the facts and circumstances supporting the finding of the trial judge, I prefer to be recorded as favoring the affirmation of his judgment.

BUCHANAN, J., concurs in this dissent.