## Staunton.

### MARGARET B. MARKLEY V. S. C. MARKLEY.

September 23, 1926.

1. DIVORCE—*Definition of Desertion.*—Desertion is a breach of matrimonial duty, and is composed first of the actual breaking off of the matrimonial cohabitation, and, secondly, an intent to desert in the mind of the offender.

2. DIVORCE—*Desertion—Duty to Seek Reconciliation.*—Before a divorce will be granted on the ground of desertion, the injured party must have, before the institution of the suit, sought in good faith a reconciliation.

3. EQUITY—*Answer—Weight of Answer Under the Oath.*—An answer under oath is entitled to great weight.

4. DIVORCE—*Desertion—Case at Bar.*—In the instant case the evidence was held to support the finding of the chancellor that the defendant wilfully deserted the complainant, and that complainant sought to effect a reconciliation, and therefore was entitled to a divorce *a mensa.*

5. DIVORCE—*Custody of the Child—Rights of Father—Interest of Child.*— While in Virginia the law recognizes the primary right of the father to the custody of the child, yet where he has not the custody and is seeking to be restored to it, the court will exercise its discretion according to the facts, consulting the wishes of the minor, if of years of discretion; if not, exercising its own judgment as to what will be best calculated to promote the interests of the child, having due regard to the legal rights of the party claiming the custody.

6. DIVORCE—*Custody of the Child—Rights of Father—Interest of Child— Case at Bar.*—In the instant case, both husband and wife were suitable persons for the custody of the child. On a decree of divorce *a mensa* on the ground of the wife's desertion, the trial court awarded the custody of the child, a girl about four and one-half years of age, then in the custody of its mother, to the father. The Supreme Court of Appeals, however, after a careful consideration of the matter, came to the conclusion that it was to the best interests of the child that it be permitted to remain in the care and custody of its mother, for the time being, with the right reserved to the father to avail himself of all the privileges granted by the provisions of section 5111 of the Code of 1919—that is, by petition to the circuit court for modification of the decree, should he so desire.

Appeal from a decree of the Circuit Court of Roanoke county. Decree for complainant. Defendant appeals.

*Amended and affirmed.*

The opinion states the case.

*Jas. G. Martin & Brother, Old & Brockenbrough, Coleman & Coleman, Lee Britt,* for the appellant.

*Hall & Buford,* for the appellee.

CAMPBELL, J., delivered the opinion of the court.

This was a suit in equity in the Circuit Court of Roanoke county. The bill was filed by S. C. Markley against his wife, Margaret Markley, seeking a divorce *a mensa et thoro* on the ground of desertion.

The bill alleges that the complainant and respondent were married on the 29th day of April, 1916, in the city of Norfolk, Virginia; that they lived together as husband and wife until the 6th day of June, 1923, in Roanoke county, when the defendant, without just cause, wilfully deserted and abandoned the complainant and has refused to return and live with complainant as his wife; that there was born of said marriage on May 8, 1919, one child, Elizabeth Brandon Markley, who is now in the custody of the defendant. The prayer of the bill is that the complainant be granted a divorce *a mensa;* that the court may take such decree as the circumstances of the case require for the custody of the infant child, then about four and a half years of age; that the court adjudicate the property rights of the parties.

The bill failing to waive an answer under oath, the defendant filed her answer under oath, denying the allega-

tions of desertion upon her part, and by cross-bill asked for a divorce *a mensa et thoro* on the ground of cruelty, and praying the custody of the child and that she be awarded alimony.

The learned chancellor, after an examination of more than five hundred pages of depositions, entered a decree granting the complainant a divorce *a mensa*, awarded him the custody of the infant child, denied the relief prayed for in the cross-bill and dismissed the same. These are the salient provisions of the decree. It is from this decree that this appeal has been allowed.

[1] In *Bailey* v. *Bailey*, 21 Gratt. (62 Va.) 43 (1871) and *Latham* v. *Latham*, 30 Gratt. (71 Va.) 392 (1871), desertion is thus defined: "Desertion is a breach of matrimonial duty, and is composed first of the actual breaking off of the matrimonial cohabitation, and, secondly, an intent to desert in the mind of the offender."

[2] This principle, announced in the first divorce suit to be decided by our appellate court, has never been changed. Subjoined, however, to the propositions that there must be an actual breaking off of matrimonial cohabitation and an intent to desert, is the third proposition, that before a divorce will be granted on the ground of desertion, the injured party must have, before the institution of the suit, sought in good faith a reconciliation.

In *Devers* v. *Devers*, 115 Va. 517, 79 S. E. 1048, it is said: "The well being and good order of society demand that husbands and wives shall in good faith endeavor to reconcile their differences and dwell together in unity and peace, rather than to make occasion for resort to the courts for redress." *Tutwiler* v. *Tutwiler*, 118 Va. 729, 88 S. E. 86.

[3] It is assigned as error that the court erred in granting a divorce to the complainant on the allegations con-

tained in the original bill, in the face of the answer filed under oath. In support of this contention great reliance is placed on the holdings in *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, and *Throckmorton* v. *Throckmorton*, 36 Va. 768, 11 S. E. 289, to the effect that an answer under oath is entitled to great weight. This proposition is well settled, but in the state of the record in the instant case, it is unnecessary to enter upon a discussion of the benefits to be derived from the sworn answer of the defendant. That the marriage of the appellant and appellee was doomed to failure is graphically set forth in the record. Before the marriage, the father of the defendant exacted a promise from the complainant that the daughter be permitted to visit his home for a period of two weeks out of every sixty days. That this agreement was carried out by the defendant is exemplified by the record as follows:

"Q. Now, Mr. Markley, if you can, I wish you would just state the number of visits that your wife has made to her parents in Norfolk, beginning with the first visit after your marriage, and the length of her stay on each visit.

"A. My record here is from a diary which I have kept for a number of years—long before I was married—and there are one or two instances which I will note as I go along, where I didn't note her trip. Her first visit to Norfolk was on May 16 to 17, 1916, and I visited there with her on our return from Bermuda on June 4 to 5, and she visited Lynchburg at a commencement there; on June 16 to 24 she visited Norfolk. On July 20 to 27, 1916, Mr. and Mrs. Britt visited us in Roanoke. On September 2 she went to Norfolk—I don't know how long her stay was. On October 27 to 31, 1916, Mrs. Britt visited us again. On December 8, 1916, through the Christmas holidays, Mrs. Markley visited

Richmond and Norfolk. On February 8 to March 16, Mrs. Markley visited Norfolk. On June 8 to July 6, 1917, Mrs. Markley visited Norfolk. On August 10 to August 23, Mr. and Mrs. Britt visited us. On August 23—this is all 1916—Mrs. Markley—

"Q. (Interrupting) 1916 or 1917?

"A. 1917. On August 23, Mrs. Markley and her mother went on a visit to Campbell county—I don't know how long they stayed. On September 5, Mrs. Markley went over with the Camp Fire Girls to Natural Bridge. October 18 to November 8, 1917, Mrs. Markley visited Richmond and Norfolk. December 24, 1917, to January 12, 1918, Mrs. Markley visited Norfolk. On March 9 to April 17, Mrs. Markley visited Norfolk. July 16 to August 26 the Britts visited us when we were at Saltville. September 11, 1918, to December 1, Mrs. Markley visited Norfolk, Va. December 1st, nineteen-eighteen to December —, 1918, she was with me at High Point, North Carolina; she continued in Norfolk then—she went back to Norfolk and stayed in Norfolk until the first of August, 1919; that was the year the baby was born. The Britts visited us from August 1, 1919, to September 2. November 7, 1919, to November 9, Mrs. Britt visited us. On November 29, 1919, to December 24, Mrs. Markley visited Norfolk. May 28, 1920, to July 13, 1920, Mrs. Markley went by Lynchburg for the commencement, and on to Norfolk. On July 13, Mrs. Britt visited us again. October 15, 1920, to October 21, Mr. and Mrs. Britt visited us. December 1920—I don't know the date—to January 12, 1921, Mrs. Markley was in Norfolk. On June 16, 1921, to August 18, 1921, Mrs. Markley was in Norfolk. On September 6, 1921, she went to Norfolk. On December 31, 1921, to January 24, 1922, she visited Norfolk. On June 26, 1922, to August 17, 1922, she

visited Europe in company with her mother.   Mr. and
Mrs. Britt visited us from August 17, I don't remem-
ber how long.   On December 21, 1922, to January 25,
1923, Mrs. Markley visited Norfolk and on June 6,
1923, she went to Norfolk again."

Descriptive of the unhappy consummation is the let-
ter of the defendant to her friend, Mrs. Welch.   In this
letter she says:   "All my married life has been worse
than death   *   *   *   I'm afraid there's no getting
back to honeymoon days.   They were wrong, too.   I
was ill from terror and fright and nerves then.   You
wonder what on earth I meant by marrying.   Well, I
was in love with an ideal and Chester was continent
and a firm believer in prohibition, my two hobbies—so
I read into him all my other ideals and became engaged.
I was wretched during my engagement and broke it.   A
year later I was thrown with him again and engaged my-
self to him again with the promise that I meant it and
would not repeat the first episode.   I spent another
wretched year and when he pressed me to hurry up the
marriage, I told him I knew that I did not love him well
enough for marriage, that I felt no desire to sacrifice
anything for him, but that if he was satisfied with that
half love, I'd keep my word to him.   I was possessed
with the idea that my word was my bond and that I
was strong enough to make myself go through with mar-
riage and make a success of it.   He was sure of himself,
too, and said that I felt as I did because I would never
have to sacrifice for him.   Think of it!   That's all the
understanding he had about marriage.   We were both
egotistical fools.   I was sure I was doing right, but I
did him a terrible wrong and he me."

[4] The record is replete with crimination and recrim-
ination.   To attempt a detailed account of the mar-

ital affairs of this ill-mated couple, contained in a record of five hundred and seventy-six pages, would but result in a narrative, crass, bizarre and in no wise helpful. We deem it sufficient to say that the evidence supports the finding of the chancellor, that the defendant wilfully deserted the complainant; that complainant sought to effect a reconciliation, and, therefore, was entitled to a divorce *a mensa*.

It is also assigned as error that the court erred in awarding the custody of the child to the complainant. This assignment involves the solution of a most difficult question. The one bright spot in the record is the testimony of a number of the most cultured and refined men and women of Norfolk, Roanoke and Salem, that both the complainant and the defendant are suitable persons to have the care and custody of this child, now in its seventh year.

In the brief of the complainant it is said: "Without discussing the evidence in detail, it may be said that the plaintiff and defendant are both suitable persons for the custody of the child. They are both in a situation that they can provide a comfortable home for the child with good surroundings, and in the best neighborhoods of the respective cities in which they live." This concession relieves us of a serious burden.

[5] The ancient rule that the father, when a proper person, is always entitled to the custody of his infant child, has been modified by numerous decisions of this court.

In *Parrish* v. *Parrish*, 116 Va. 481, 82 S. E. 119, 121 (L. R. A. 1915A, 576), which was a case involving the custody of an infant, Judge Keith said: "There is no duty which a court has to perform more difficult than that which confronts us in this case, for whatever our decision may be, we are compelled to turn a deaf ear to

the pleadings of nature, separate a parent from its child and deprive the child of the care and nurture of one of its parents. As the wisest solution of this difficulty, the tendency of the courts has been, especially in recent years, to consider all the facts and circumstances of the particular case, and to determine what is best for the present and future interests, moral and physical, of the child. Our law fully recognizes the primary right of the father to the custody of the child (*Carr* v. *Carr*, 22 Gratt. [68 Va.] 168; *Latham* v. *Latham*, 30 Gratt. [71 Va.] 307); but it is also well established that 'where he has not the custody and is seeking to be restored to it, the court will exercise its discretion according to the facts, consulting the wishes of the minor, if of years of discretion; if not, exercising its own judgment as to what will be best calculated to promote the interests of the child, having due regard to the legal rights of the party claiming the custody.' *Armstrong* v. *Stone and Wife*, 9 Gratt. (50 Va.) 102; *Merritt* v. *Swinley*, 82 Va. 433, 3 Am. St. Rep. 115; *Coffee* v. *Black*, 82 Va. 567.

"In *Stringfellow* v. *Somerville*, 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623, this question was fully considered and the rule deduced from many authorities there cited was that 'when the father is claiming to recover the custody of his child, the court will exercise its discretion according to the facts and what appears to be best calculated to promote the infant's welfare'. "

[6] The record discloses that it is the intention of the complainant to place the child in the home of his parents, who reside in the city of Roanoke. While it does appear that the paternal grandfather has expressed a willingness to have the child brought to his home, it nowhere appears that this willingness is shared by the paternal grandmother, who, the record shows, is a semi-invalid. It also appears that living in the home of com-

plainant's parents is an invalid sister. As the business of the father is conducted in Salem, Virginia, it is apparent that he is not often in a position to devote the requisite care and attention to the child that its tender years require. On the other hand, the record discloses that it is the one desire of the maternal grandparents that they share the responsibility with the mother in the rearing and support of the child.

Bearing in mind the rule laid down in the *Parrish Case, supra,* we have come to the conclusion, after a careful consideration of the matter, that it is to the best interest of the child that it be permitted to remain in the care and custody of its mother, for the time being, with the right reserved to the father to avail himself of all the privileges granted by the provisions of section 5111 of the Code of 1919—that is, by petition to the Circuit Court of Roanoke county for a modification of the decree, should he so desire.

There are other assignments of error, but we are of the opinion that they are without merit.

For these reasons, we are of the opinion that the decree of the circuit court should be affirmed in all things, except in so far as it awards the custody of the infant, Elizabeth Brandon Markley, to the complainant, and to this extent it will be so amended to award the custody of the said infant to its mother, Margaret B. Markley.

*Amended and affirmed.*