## Staunton

### ELIZABETH WANGLER MULLEN v. JAMES W. MULLEN, II.

September 8, 1948.

Record No. 3402.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan
and Staples, JJ.

*Christian, Barton, Parker & Boyd* and *A. C. Epps,* for the appellant.

*Tucker, Mays, Cabell* and *Moore,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This is a suit instituted in September, 1946, by James W Mullen, II, hereinafter referred to as the complainant, against his wife, Elizabeth Wangler Mullen, for a divorce upon the ground of desertion. The bill further prayed that the complainant be awarded the permanent and absolute custody of the infant child of the parties. The defendant filed an answer and cross-bill, in which she denied the desertion of the complainant, and charged him with cruelty and the constructive desertion of her. She prayed for a divorce *a mensa et thoro,* custody of the infant child, alimony

for herself, support money for the child, suit money and counsel fees.

At a hearing on January 7, 1947, upon testimony taken *ore tenus*, the trial court allowed the defendant alimony *pendente lite* and support for her child of $240 a month, directed the payment of $400 for additional alimony and support to the date of the hearing, and allowed certain counsel fees. Thereafter, testimony was taken by depositions, except on questions relating principally to the payment of alimony, support money and counsel fees.

On October 23, 1947, the trial court entered its decree granting a divorce *a mensa et thoro* to the complainant, dismissing defendant's cross-bill; awarding custody of the child to complainant for nine months of each year (the school year from September 10th to June 10th), and to defendant for the remaining three months; directing payment of $90 per month to the defendant for support of the infant child pending appeal; relieving complainant of the obligation to pay further alimony; and awarding fees to counsel for the defendant. From this decree the defendant appealed.

Mrs. Mullen contends that the trial court erred in granting the complainant a divorce and dismissing her cross-bill; in providing for a division of the custody of the infant; and in refusing to allow proper alimony, additional counsel fees, and support money for the infant.

The evidence is voluminous, containing more than five hundred printed pages. There were many charges, counter-charges and explanations as to the conduct of the parties. Most of them related to disagreements and disruptions of a minor nature. In retrospect, by reason of the present hostile attitude of the parties towards each other, these incidents apparently have been magnified. Each party has so interpreted them as to justify the attainment of their respective objectives in this proceeding. The material facts are not greatly in conflict. It will serve no useful purpose here to make a detailed examination and discussion of the evidence. It has been carefully read and considered, and we shall content ourselves with a general statement of the material and substantial facts.

James W. Mullen, II, is the only surviving child of Mr. and Mrs. James Mullen, respectively seventy-one and sixty-seven years of age. Mr. and Mrs. Mullen, Sr., and their son live in a large and expensive home surrounded by several acres of land in a fine residential district in the city of Richmond. The plaintiff is a graduate of Princeton, where his academic record was so outstanding that he was awarded the highest honors bestowed by that college upon its students and graduates. He received his B. A. degree in 1939, and Ph. D. in June, 1942.

Immediately upon his graduation, intensely interested in science, he engaged in research work for the United States government. During the period of World War II, he was deferred, at the request of Princeton, from military service, in order to apply his talents to highly technical scientific tasks in the advancement and development of war materiel for the Navy.

In 1940, then twenty-six years old, he met the defendant, nineteen years old, who was born and raised in Princeton, New Jersey. She there lived with her mother and sister, where they enjoyed an excellent social standing. They were married in October, 1941. A child, Sally Carter, was born to them in 1942. They first lived in apartments in Princeton; but came to Richmond in the summer of 1942 for a short vacation. They then went to Anniston, Alabama, where complainant was employed. In December of 1942, the duties of the complainant took him to Murray Hill, New Jersey, and he then resided with his family in the near-by town of Madison. At this time he was earning $4,000 a year, which increased two years later to $6,000.

In December, 1944, complainant established his own laboratory in Richmond, Virginia, and obtained a connection with the Navy Ordnance Department, which made it possible for him to further develop his scientific plans. He moved his wife and child to his parents' home in Richmond. In the home of his parents, they were assigned three rooms, and the defendant assisted Mrs. Mullen, Sr. in doing the cooking and housework for a considerable period of time

owing to the lack of available domestic servants. For a portion of this time the complainant worked in Washington, and commuted to Richmond over the week-ends until June, 1945. At the end of 1945, complainant's salary was $7,500 per year and in 1946 it was raised to $10,000.

Until June, 1945, the married life of the couple, with the exception of a few trivial disputes, moved along smoothly. Thereafter the defendant expressed her desire for a home separate and apart from that of the parents of her husband. At that time in Richmond, as elsewhere in this country, the housing problem was acute. The complainant was so actively and intensely interested in his business that he had little spare time. However, the complainant, his parents, and his wife undertook to find a suitable home which they could purchase or lease. They enlisted the aid of several real estate agents, advertised in the newspapers, and made personal efforts, all directed to the end desired. However, they were unable to find a home or quarters which were suitable or agreeable to both complainant and the defendant. Prices were too high or locations undesirable. On two occasions, at least, the defendant declined to move to available quarters for reasons sufficient to her. She was not disposed to purchase property which would impose a debt on her husband. While unhappy about the situation, she did not express her dissatisfaction outside of the family nor even to her mother-in-law and father-in-law.

It may be said generally that a husband, consistent with his financial ability, should provide his wife a home in which she shall be the mistress, free from interference from members of her husband's family. But this rule is dependent upon the facts of the particular case and the peculiar circumstances existing. Here the evidence shows that the husband was cooperative in an honest effort to accord with his wife's desires for a separate home. He did not wilfully fail in the performance of his duty. He did provide her a home with comfortable quarters at the residence of his parents. She was not there abused or ill-treated by his parents. In fact, she expressed herself as being rather

devoted to them on account of their kindness to her. The evidence supports the finding of the chancellor that the complainant made a *bona fide* effort to secure a separate home for his wife, and that his conduct did not justify her wilful desertion of him, nor amount to constructive desertion on his part.

On July 28, 1946, the defendant left her home in Richmond for a month's visit to her mother, who was then staying in Nantucket, Massachusetts. Between August 1st and August 24th, she wrote normal, affectionate letters to her husband without indicating any purpose not to return to Richmond.

On August 27, 1946, she advised the complainant by long distance telephone that she did not intend to return to him. She said she would return to Richmond early in September to "collect her things," see her husband and his family, and return permanently to her mother's home at Princeton.

On September 7th, complainant went to Princeton to see his wife. He urged her to return to Richmond with him. She then told him she wanted a divorce; that she wanted to go to Reno to institute the necessary proceedings; and that she wished to have the custody of their child, with support from the complainant for herself and child. She said that she had retained a lawyer to represent her, and asked him to go with her to the lawyer's office and sign an agreement covering these matters. The complainant positively refused to consider her proposal, and continued to plead with his wife to abandon such a plan. He discussed the legal uncertainties of a Reno divorce, both as to themselves and as to their child, and refused to sanction her plan in any particular. He stated that he would enter into no agreement without the advice of his attorney, and that if she insisted on her plan for a divorce, suit should be filed in Virginia.

Being unable to come to an agreement or to effect a reconciliation, both thought that prompt action should be taken. Since the defendant planned to go to Richmond to get her belongings, he suggested that she go to Richmond

that night with him, and there arrange for a settlement of their difficulties in conference with his attorney. They went to New York city, took the night train to Richmond, and occupied the same berth in a Pullman car, arriving in Richmond Sunday morning, September 8, 1946.

Upon arrival in Richmond, the parties went to the home of the complainants' parents. His account of what took place is as follows:

"A. We then went to my parents' home on Cary Street Road where after breakfast Betty talked with Mother and Dad and reiterated her decision of the previous day that she was leaving and spent the rest of the day packing and called on one or two mutual friends and then she spent the night over at Mrs. Wilson's and the following day returned to Princeton.

"Q. At this conference between your wife and yourself and Mr. and Mrs. Mullen did she give any reasons for her action in leaving?

"A. Her reasons were about the same as always. There was nothing particularly well crystallized. It was the out-come of a series of circumstances which resulted in her loss of affection for me and couldn't go on with her marriage."

Neither the complainant nor his parents, who were very much distressed by the situation and earnestly sought an adjustment of the marital disagreement, were able to get the defendant to change her plans, although they repeatedly urged her to do so on Sunday and Monday. All of their entreaties were in vain and the defendant returned to Princeton about noon on September 9th, and has since not lived with the complainant. His subsequent efforts for a reconciliation were fruitless.

A complete answer to the defendant's charges of cruelty and desertion is complainant's denial thereof and the lack of corroborative testimony in support of her charges.

There is no evidence of cruelty or reasonable apprehension of bodily hurt. Whatever services the defendant rendered in the Mullen family home were voluntary. The general allegation of interference by Mrs. Mullen in the domestic

affairs of the defendant has not been established. On the other hand, there is strong and substantial evidence that the elder Mullens were consistently considerate of the defendant, that they were, in fact, fond of her and evidenced their devotion by financial aid and assistance from time to time and by other services rendered in undertaking to make the social life of the defendant happy and successful. As might be expected, the elder Mullens were greatly interested in the welfare of their granddaughter, the sole issue of their only child.

There was an actual breach and breaking off of the marital cohabitation by the defendant, and she fully expressed her intent to desert the complainant. This constitutes desertion as defined in Virginia. *Bailey* v. *Bailey*, 21 Gratt. (62 Va.) 43; *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307; *Markley* v. *Markley*, 145 Va. 596, 134 S. E. 536.

The trial court did not err in granting the complainant a divorce from bed and board.

The issue of the custody of the six year-old female child of the parties presents a serious and perplexing question. A correct solution depends upon the peculiar facts and circumstances of the case. In consideration of the facts and circumstances, there are a few well defined principles.

In line with the authorities generally we have departed from the old English common law rule which favored the right of the father to the custody of his child. In numerous decisions we have modified the rule stated in *Carr* v. *Carr*, 22 Gratt. (63 Va.) 168, decided in 1872, and in *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, decided in 1878. This modification has been recognized by statute where husband and wife live in a state of separation without being divorced. Virginia Code, 1942, (Michie), section 5327.

In Virginia, we have established the rule that the welfare of the infant is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. All other matters are subordinate. *Stringfellow* v. *Somerville*, 95 Va. 701, 29

S. E. 685, 40 L. R. A. 623; *Parrish* v. *Parrish*, 116 Va. 476, 82 S. E. 119, L. R. A. 1915A, 576; *Fleshood* v. *Fleshood*, 144 Va. 767, 770, 130 S. E. 648; *Markley* v. *Markley*, 145 Va. 596, 602, 134 S. E. 536; *Darnell* v. *Barker*, 179 Va. 86, 93, 18 S. E. (2d) 271; *Elam* v. *Elam*, 182 Va. 469, 472, 29 S. E. (2d) 222.

See also, Vol. 3, Digest of Va. and W. Va. Rep. and Permanent Supplement (Michie), Divorce, section 51, and cases cited, and Vol. 7, Va. & W. Va. Digest (West), Divorce, section 298 (1) *et seq.*

■ The rule is to be administered with as much consideration for the tender ties of affection of the parents as possible under the circumstances, and especially when each parent is shown to be a fit and proper custodian of the child.

In this case there has been no serious attack upon the character and basic fitness of either parent to have the custody of their child. This is recognized in the decree of the trial court, where its custody was divided between its father and mother. Complainant and defendant are both more or less normal human beings, enjoying the usual diversions and pleasures of their age and the society in which they walk. Each has some personal traits perhaps undesirable to the other, and their temperaments and desires have clashed at times; but there is nothing inherently wrong in their character and aims.

■ The rights of neither parent take precedence over the rights of the child. The welfare of the child is superior to the wishes and personal desires of either of them. In considering their qualifications and fitness, we must look to their adaptability to the task of caring for the child; their adaptability to control and direct it; the age, sex, and health of the child; its temporal and moral wellbeing, as well as the environment and circumstances of its proposed home; and the influences likely to be exerted upon the child.

■ It is now generally recognized that the mother is the natural custodian of her child of tender years, and that if she is a fit and proper person, other things being equal, she

should be given the custody in order that the child may receive the attention, care, supervision, and kindly advice, which arise from a mother's love and devotion, for which no substitute has ever been found. Human experience supports the policy that young children should not be deprived of the care of their mothers and of their love and tenderness, which may be counted upon most unfailingly. Experience also teaches that children grow up more normally when reared by young people rather than older people.

Accordingly, it has been held that children of tender age, especially girls, will be awarded to their mothers, if fit and suitable; and that where no injury or disadvantage will result to the child, the feelings of the maternal parent must be given consideration. Nelson on Divorce and Annulment (2d Ed.), Vol. 2, page 175; *Beaumont* v. *Beaumont*, 106 W. Va. 622, 146 S. E. 618; 27 C. J. S., Divorce, page 1172, section 309 (c). Thus, in *Markley* v. *Markley, supra,* a four and one-half year-old girl was placed in the custody of her mother, and in *Darnell* v. *Barker, supra,* a male child, four and one-half years old, was awarded to the mother.

The complainant in this case is intensely occupied with his business seven days of each week. He works at his industrial plant thirteen miles from his parents' home, gets to his office by 8:30 a. m. each day, and does not leave until between 5:30 and 6:30 p. m. Consequently, he has little or no opportunity during the day when his child is awake and active to give her supervision and control. He must, of necessity, leave such supervision to his sixty-seven year-old mother and such help as he can employ.

The grandparents are excellent people and fond of the child; but that cannot take the place of a mother's love. None of the training which the father received in his studies or professional duties have equipped him to give that care and attention to a six year-old female child which a mother can give by reason of her natural advantages. It is highly improbable that the elderly grandmother, no matter how great her love may be, can give to the child that sustained and undivided attention which the young mother can supply.

█ The question is not which of the parents can surround the infant with greater luxury or which of the two will be able to give or bequeath her the greater amount of money or property; but with which of them she is likely to be reared and trained so as to be better prepared for life.

According to the evidence, the mother will keep the child in a comfortable, clean, attractive home, in a good residential section of Princeton. In the immediate neighborhood there are desirable playmates of her age, and she can attend an excellent kindergarten or preparatory school in which she has already been enrolled. In this home there lives the mother of the defendant, a woman of good moral character, high social standing, and excellent business capacity.

Numerous witnesses, friends and associates of the defendant, have testified that she is a good, patient, unselfish, understanding mother. She gives her entire time to the child. She takes her to school in the morning, calls for her at noontime, takes her out in the afternoon to play with other children, or has them in the house to play with her, reads to her, washes and clothes her, and puts her to bed each night with loving tenderness. There is no contradiction of this, except by the innuendo of the complainant.

█ Even though the defendant has been found to be at fault in deserting her husband, her fault was not based on any moral delinquency. She has committed no fault against the child. The custody of the child is not to be ordered with a view of heaping punishment upon the defendant by reason of her responsibility for the severance of the marriage ties, where the substantial evidence shows that the mother is a fit person to share the custody.

█ The advisability of dividing or alternating the custody of the child has been seriously considered. While there are certain disadvantages in such division, there are also important advantages and benefits. It gives the child the experience of two separate homes. The child is entitled to the love, advice, and training of both her father and her mother. Frequent associations, contact, and friendly relations with both of her parents will protect her future

welfare if one of her parents should die. It gives recognition to the rights of parents who have performed obligations as parents.

We recognize the affection which the complainant bears to his daughter. He has not been held responsible for the condition which separates them. It would not be fair or reasonable, under the circumstances, to deprive him of the right to have her custody for a portion of the time, or to visit her at reasonable times, provided such right be exercised for the welfare of the child.

During the taking of the evidence, the complainant expressly stated that no attack was intended to be made on the defendant's moral character. Moreover, it was clearly established that she was firm of mind, well qualified to ascertain what was best for her daughter in her formative years, and capable of dealing with the problems likely to arise in the upbringing of a female infant. Even though, as a result of this marital controversy, she may be hereafter required to obtain gainful employment to support herself, it is not likely that such employment will require her to be separated from her child to any such extent as the evidence shows the occupation of the complainant has required separation on his part. Whatever time she may have to devote to her child she can give with a more natural understanding of the latter's needs. On the other hand, there is no evidence whatever that the complainant is qualified to give the child such personal attention as she requires.

As a last resort the complainant was forced to contend that the defendant has shown herself to be so emotionally unstable as to be unfit to be entrusted with the raising of a child. This is largely based upon the action of the defendant in bringing about a severance of her marital ties. That the learned chancellor of the trial court did not agree with this contention is evidenced by his award of the custody of the child to the defendant for the school vacation period of three months,—a period which presents the greatest possible opportunity for the child to be under the complete influence of her mother for the entire time, day and night.

We are not disposed to enter into a discussion of the varied causes, manifestations, and aspects of emotional instability. We do not have, nor do we think we need, the expert opinion of a psychiatrist as to what extent the inability of husband and wife to live together in mutual love and harmony may reflect their respective qualifications to raise a child properly. We venture to say, however, that a comparison of the qualifications of the respective parties, based on the circumstances shown by the record, will not be to the greater detriment of the defendant.

The complainant in his youth was a brilliant and unusual student. He received his doctorate in science at a very early age. In work and in play he manifested an intense devotion to whatever particular object he had in view. The small affairs of life had little call on his attention. He somewhat boldly confesses his superior mental and educational qualities and brilliant achievements in the field of science. So intensely absorbed in his scientific pursuits he had little time or place for domestic questions, little time to spare in company with his wife and child at home or on their vacations. He was content that she should care for their child until she deprived him of her company and person. No question of her competency arose until this action was brought.

We are not disposed to believe that firmness on the part of a wife in her insistence for a separate home should be sufficient to establish emotional instability. Her claim to such a home is understandable under most circumstances. Her rights in that respect are uniformly recognized, dependent, as we have heretofore said, upon the facts of the particular case and the peculiar circumstances existing. That the defendant wished to preserve her marital status was evidenced by her continuance of the most intimate marital relations with the complainant up to the night before their separation.

After all, it seems clear that both husband and wife were possessed of strong and determined characters. They were unable to reach a common viewpoint or agreement for

reasons sufficient to each. Each refused to yield to the other. This is an unfortunate situation, for which no definite remedy has been discovered. We are not disposed because of this to let the child suffer more than can be avoided. The mistakes of her parents we will not visit on the child.

All of what we have said outweighs the difference in the respective financial situations of the parties. In any event, it is the duty of the father to provide financial support for his child. In this case, the plaintiff promises that his daughter will get that support wherever she may be.

It is clear, we think, by reason of her age, sex, and the surrounding circumstances, that the welfare of the child demands that during the period of the year in which she is required to attend school, and during a portion of the summer months, she should be in the custody of her mother.

We further think it would be advisable that the father be awarded the custody of the child a portion of the summer vacation months of each year, that is, from June 15th to August 15th of each calendar year, with the right of visitation in either parent at reasonable times during the calendar year.

This case is still on the docket of the trial court. Appropriate orders regulating the custody and maintenance of the child as she grows up may be made from time to time, as the circumstances of the parents and the welfare of the child may require. Virginia Code, 1942, (Michie), section 5111.

The trial court declined to award the defendant any permanent alimony or temporary alimony pending the appeal. In view of the conclusion that no error was committed in granting the complainant a divorce, the trial court did not err in these respects. The awarding of such alimony is highly discretionary, and we do not think the court abused its discretion. *Martin* v. *Martin*, 166 Va. 109, 184 S. E. 220; *Eaton* v. *Davis*, 176 Va. 330, 339, 10 S. E. (2d) 893; *Hulcher* v. *Hulcher*, 177 Va. 12, 12 S. E. (2d) 767.

Fifteen hundred dollars were allowed defendant's

counsel for services in the trial court. In addition to expenses amounting to $181.20, a further sum of $1,090.35 was charged to complainant for the cost of making up and printing the record. No allowance was made in the trial court to defendant's counsel for the conduct of these proceedings in this court. The record shows that the complainant, in addition to his annual salary of $10,000, is a substantial stockholder in two corporations possessing fairly large assets. The prosecution of the case here required a high degree of ability and considerable time in preparation. In view of the services rendered by defendant's counsel, we are of opinion that the complainant should be required to pay to the attorneys for the defendant the further and additional sum of $500 in full compensation for their services rendered in this cause.

The evidence shows that the expenses incident to the care, custody and education of the child amount to about $120 per month. The defendant has no independent funds and, because she will have the custody of the child the larger portion of the time, she will be unable to obtain full time employment. The mother of the defendant, although financially able, is under no legal duty to support the child. The sum of $90 per month is insufficient for support and adequate education. The decree of the trial court will be modified, and the allowance increased to $110 per month for the support, maintenance and education of the infant child during the months when she is in the custody of her mother.

In conclusion, we are of opinion to affirm the decree of the trial court, dismissing the cross-bill of the defendant, and granting a divorce *a mensa et thoro* to the complainant; to modify the provisions of the decree as to the custody of the child by awarding her custody to the defendant from August 15th to June 15th of each year and to the complainant from June 15th to August 15th of each year, with the right of reasonable visitation in either parent; and to modify the decree by allowing $110 per month, payable by the complainant to the defendant, on or before the first day of each month commencing October 1st, 1948, for the support,

maintenance, and education of the infant child. It is further adjudged, ordered, and decreed that the complainant pay to the attorneys of record for the defendant the further and additional sum of $500, as full compensation for their services rendered in this case, and that he pay the cost of this proceeding.

The cause is remanded to the lower court for such further proceedings as may be necessary.

*Affirmed in part, modified in part, amended and remanded.*

HUDGINS, C. J., dissenting.

I am in full accord with that part of the majority opinion which declares that the evidence introduced conclusively supports the chancellor in granting the husband a divorce *a mensa et thoro*; I am equally strong in my conviction that the decree of the chancellor awarding custody of the child to the father for a major part of every year should be affirmed.

The statute, section 5111 (Michie's Code) empowers the trial court to award the custody of minors in all controversies between husband and wife in this language: ". . . the court may make such further decree as *it shall deem expedient* concerning . . . the care, custody, and maintenance of their minor children, and may determine with which of the parents the children or any of them shall remain." Further power is given the court to change the custody "as the circumstances of the parents and the benefit of the children may require."

It will be noted that the discretion to be exercised is the discretion of the trial court, and not the discretion of this court. This court heretofore has held that the discretion of the trial court will not be disturbed unless the evidence clearly shows that it has been abused. This principle is firmly inbedded in the decisions of this court. We said in *Butler* v. *Butler*, 145 Va. 85, 133 S. E. 756: The Supreme

Court of Appeals "has always been loath to interfere with the discretion of trial courts in matters touching custody of minor children. It seems (sees) no reason for doing so in this case. The evidence indicates that the respondent is a far more stable person than complainant to rear these infant children, but if he should prove an improper custodian, it is always in the power of the court, and it would be its duty, to make such other provision for the care and custody of these infants as would promote their best interests." To the same effect, see: *Meyer* v. *Meyer*, 100 Va. 228, 40 S. E. 1038; *Markley* v. *Markley*, 145 Va. 596, 134 S. E. 536; *Duff* v. *Duff*, 145 Va. 526, 134 S. E. 555; *Martin* v. *Martin*, 166 Va. 109, 184 S. E. 220; *Elam* v. *Elam*, 182 Va. 469, 29 S. E. (2d) 222.

There is another principle which the majority opinion ignores—or rather refuses to apply—namely, that the innocent party upon whose prayer the divorce is granted, other things being equal, usually will be given the custody of the children. *Owens* v. *Owens*, 96 Va. 191, 196, 31 S. E. 72; *Martin* v. *Martin, supra; Nix* v. *Nix*, 186 Va. 14, 20, 41 S. E. (2d) 345. Mr. Justice Gregory, speaking for the court in the *Nix Case*, said: "In cases of this nature the general rule is that the innocent parent is entitled to the custody of children. In this case there is no fact or circumstance shown by the record which would require us to withhold the application of the general rule." This statement and the application of the general rule is fully warranted by the evidence in this case.

Human experience supports the conclusion that it is not best for young children to be deprived of the care of either mother or father. The unwarranted, the unreasonable action of the mother in this case is conclusive of the fact that she, without cause, brought about a situation which will inevitably deprive her child of the care, the tenderness, and the training of either the father or the mother.

When a marriage barque is wrecked upon the rocks that appear upon every sea of matrimony, the innocent child of the marriage is the helpless victim. The weeping mother

and the grief-stricken father have our compassion, but the welfare and best interests of the child are our paramount consideration. The awarding of such care and custody involves a most difficult and perplexing question. No court can be positive, at the time, that its award will prove to be for the best interests of the child. This uncertainty is the reason that the General Assembly in Code, section 5111, empowers the court to alter or change the custody as subsequent events might prove to be for the child's welfare. To this welfare the personal desires of the parents must give way. What is best for the future welfare of the child is the controlling factor in determining its best interests, not its immediate happiness.

The majority of the Court yields to the protestation of love and affection that this mother claims to have for her child. Yet this love and affection was not sufficiently strong to restrain her from leaving her husband without cause.

The husband provided his family with a comfortable home in one of the best residential sections of Richmond, and one in keeping with his social standing. While the home was owned by the husband's parents, it was large enough to comfortably house two families. The wife's allegation and testimony to the effect that her husband made no attempt to provide a home separate and apart from his parents was refuted by the overwhelming weight of the testimony, and it is so declared in the majority opinion. The fact that the shortage of housing and the lack of domestic help reached its most acute stage in 1946 made no impression upon her, a fact which shows that she either lacks sufficient stamina, or entirely disdains the effort to meet the realities of life.

Another bit of evidence tending to show her instability is the fact that in the summer of 1946, while she and her child were on a visit to her mother in Madison, New Jersey, she wrote her husband, early in August, a most ardent and intimate letter in which, in substance, she said she was counting the moments until she could return to his arms and be

invigorated by his kisses. This letter shows that relations between her and her husband were not only pleasant and cordial, but most affectionate; yet within two weeks thereafter, and without apparent rhyme or reason, she wrote him that she was not going to live with him any longer, but was going to Reno, Nevada, to obtain a divorce and asked her husband to surrender the care and custody of the child and for separate maintenance for herself and child.

She regarded the marriage vow like a child who on being handed a box of candy, takes a piece and bites into it, puts it back, and selects another piece in an effort to find a sweet to her taste. She has a complete disregard for the dignity of marriage and all that it implies.

We can only judge the future by the past. If this wife has so little conception of the dignity, obligations, and responsibilities of the marriage vows, how can a court with any degree of certainty decide that she will not regard the obligations and responsibilities of motherhood in the same light vein? A child needs not only love and affection, but it needs to be trained to meet the responsibilities of life, to be taught the sanctity of an obligation, obedience to those in authority, and an intelligent understanding of the verities of life. How can it be expected that this child will be so taught and trained in these fundamentals by an emotional, unstable mother who ignores them herself? Judge Keith, speaking for the court on this phase of the question in *Owens* v. *Owens, supra,* said: "The innocent parent on whose prayer the divorce is granted will usually have the custody of the children. A woman compelled by her husband to resort to divorce ought not to obtain it at the expense of losing the society of her children. And as one who has done well or ill in the marriage relation will be likely to do the same in the parental, all courts lean to the innocent parent when determining the custody of the child." In the *Nix Case*, cited above, this court for the same reasons awarded the custody of a child to its father.

The financial ability of either spouse to support, maintain. and educate the child is not the dominating factor in deter-

mining which should have its custody, but it is a factor to be considered.

Mrs. Mullen has no income or property of her own; she is wholly dependent upon her mother, Mrs. Margaret Wangler, who is herself a divorced woman, engaged in the real estate brokerage business. Like her daughter she has no income other than what she earns. She maintains a separate real estate office, and testified that her net income for 1946 was $31,081.14 and for the preceding year $23,000. While this is a substantial income, it varies from year to year, and is dependent upon economic conditions and the activities of the broker. Regardless of her income, she is under no legal obligation to support her daughter or her granddaughter and has not promised to do so. The present and future financial outlook of the wife is not bright. She testified that she is occupying an apartment which contains a combined living room and bedroom, a kitchen, and bath, with an enclosed porch. She has studied stenography and can type now, but it would take her some time to refresh her shorthand. She has not sought employment because she has devoted her whole time to her child except for three hours a day when the child was in a nursery school. She is allowed in the majority opinion $110 per month for the support of the child but nothing for her own maintenance. Under these circumstances necessity will compel her to seek employment, in which event it will be necessary to employ a nurse to look after the six-year-old child. Therefore, the mother will be in no position to give any more personal care to the child during business hours than the father.

Mr. Mullen, the husband, on the other hand, has a business of his own, and within two years his salary has been increased from $6,000 to $10,000. He is the only child of wealthy parents, and has taken his doctor's degree in chemistry. He was so proficient in this line of endeavor that his services were commandeered by the government and, during the war, he was required to devote his time and ability to developing chemicals for war purposes. He is in a position now to give his child a comfortable home, his personal care,

and to supervise her training and education, in which he will be aided by both his mother and father. His financial outlook is bright, the possibilities being that his income will be increased from year to year. The present and future financial ability of the husband to support, maintain, and educate the child is fully established.

While Mrs. Mullen, senior, the paternal grandmother, may not be as efficient or as understanding in her love and tenderness for the child as a normal mother would be, we are not dealing with a normal mother. At least the grandmother's love, care, and tenderness for her granddaughter are very superior to those of any hireling, and she has expressed an earnest desire to give her grandchild all the love, care, and tenderness of which she is capable.

It is stated in the majority opinion that the welfare of the child is the primary, paramount, and controlling consideration of the Court in all controversies between parents over the custody of their minor child. The following cases are cited to support that statement: *Stringfellow* v. *Somerville*, 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623; *Parrish* v. *Parrish*, 116 Va. 476, 82 S. E. 119, L. R. A. 1915A, 576; *Fleshood* v. *Fleshood*, 144 Va. 767, 770, 130 S. E. 648; *Markley* v. *Markley*, 145 Va. 596, 602, 134 S. E. 536; *Darnell* v. *Barker*, 179 Va. 86, 93, 18 S. E. (2d) 271; *Elam* v. *Elam*, 182 Va. 469, 472, 29 S. E. (2d) 222. This is a correct statement of the law in Virginia, but in no case cited has this court gone as far in denying an innocent spouse the custody of his child as the majority opinion goes in this case.

In three of the above cases, *Stringfellow* v. *Somerville*, *Parrish* v. *Parrish*, and *Fleshood* v. *Fleshood*, the question of custody arose on a writ of *habeas corpus*. In the *Stringfellow Case* the mother with the consent and acquiescence of the father had given her child to her two sisters to be reared. After the sisters had retained the child for six years, the father sought its custody. The trial court weighed the claims of the two sisters and the father and determined that, under the circumstances of the case, the father had sur-

rendered his rights to the custody of his child. In the *Parrish Case*, the father, a citizen of Chicago, had obtained a divorce from his wife in that city. At the time the divorce decree was entered the mother was living with the child in Suffolk, Virginia. The mother proved that she was in a financial position to support and maintain the child, and that the child's health might be seriously impaired if it were required to live in Chicago. The trial court agreed with this view and awarded the mother the custody for nine months of the year, authorizing the father to have the custody for the three summer months. Judge Keith, speaking for the Court, said:

"As we have said, the evidence fully sustains the finding of the court, and it cannot be read without sincere regret that a man and a woman who, with respect to others, have established the reputation and character among those with whom they have lived which they have won for themselves, should not by mutual forbearance and compromise be able to live together and give to their infant son the strength and support which is due from a father tempered by the tenderness and love which is always present in a mother's heart.

"There is no duty which a court has to perform more difficult than that which confronts us in this case, for whatever our decision may be, we are compelled to turn a deaf ear to the pleadings of nature, separate a parent from its child and deprive the child of the care and nurture of one of its parents. As the wisest solution of this difficulty, the tendency of the courts has been, especially in recent years, to consider all the facts and circumstances of the particular case, and to determine what is best for the present and future interests, moral and physical, of the child. Our law fully recognizes the primary right of the father to the custody of the child (*Carr* v. *Carr*, 22 Gratt. (63 Va.) 168; *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307); but it is also well established that 'where he has not the custody and is seeking to be restored to it, the court will exercise its discretion according to the facts, consulting the wishes of the minor if of years of discretion; if not, exercising its own judgment

as to what will be best calculated to promote the interests of the child, having due regard to the legal rights of the party claiming the custody.' "

The maternal grandfather to whom the child had been given by the father on the death of the mother in *Fleshood* v. *Fleshood, supra,* filed a petition for a writ of *habeas corpus* against the father who had claimed the child. The trial court awarded the custody to the maternal grandfather. On appeal the temporary possession of the child was given to the father with direction that he be required to keep it at the home of his father on the ground that the wife, son, and daughter of the maternal grandfather had died of consumption; that another son had been stricken and was in a sanatorium; that the health of the daughter upon whom would fall the care of the child was precarious; and that, hence, the child's health might be seriously impaired if required to stay there. This court, however, ordered the case to be retained upon the docket to give the maternal grandparent an opportunity to remove the menace to health from his home.

The trial court in *Markley* v. *Markley, supra,* granted the husband a divorce and the custody of his 6½ year old child. This court affirmed the decree as to the divorce but gave the custody of the child to the mother without prejudice to the right of the father to apply to the trial court for modification of the decree. The basis of the decision seems to have been as follows:

"The record discloses that it is the intention of the complainant to place the child in the home of his parents, who reside in the city of Roanoke. While it does appear that the paternal grandfather has expressed a willingness to have the child brought to his home, it nowhere appears that this willingness is shared by the paternal grandmother, who, the record shows, is a semi-invalid. It also appears that living in the home of complainant's parents is an invalid sister. As the business of the father is conducted in Salem, Virginia. it is apparent that he is not often in a position to devote the requisite care and attention to the child that its tender years

require.  On the other hand, the record discloses that it is the one desire of the maternal grandparents that they share the responsibility with the mother in the rearing and support of the child."

The facts in the *Markley Case* are not similar to the facts in the case now under consideration.  The maternal grandparents with whom the mother and child had been living for approximately three years desired to share the responsibility with the mother in the rearing and support of the child.  In the case now under consideration the maternal grandmother, although she stated she had an income in 1946, of more than $31,000, has indicated no purpose or desire to share the mother's obligation, financial or otherwise.  She did advance the money for the support of the mother after the mother left the father, but the trial court ordered this money repaid to the mother.  In the *Markley Case* the father conceded the fitness of the wife as custodian and the parity of the living conditions offered by her parents.  No such concession is here made nor do the facts in my judgment support any such conclusion.

The facts in *Darnell* v. *Barker* and *Elam* v. *Elam, supra,* are entirely dissimilar to the facts in the case now under consideration.  The fundamental principles were restated in each case and in each case the innocent party was awarded the custody of the child.

In affirming the judgment of the trial court in the *Elam Case,* we said:  "The chancellor could have granted the prayer of either parent, or he could have refused the prayers of both parents and placed the child in the custody of the State Welfare Board.  However, in the exercise of the sound discretion with which the statute clothes him, he decided that the welfare of the child required that his care and training be entrusted to the wife and the mother, notwithstanding the fact that she had misconceived her duty to secure an absolute divorce before attempting to contract marriage with another person.  The suit is still pending on the docket.  The order awarding custody may be changed to meet the exigencies of the situations which hereafter may

be brought to the attention of the court.. Viewing the case as a whole, this court cannot say, as a matter of law, that the chancellor, in reaching his conclusion has abused the discretion reposed in him."

Without further elaboration, the principal reasons which convince me that the innocent spouse should be awarded the custody of the child may be summarized as follows:

(1) The wife has failed to carry the burden that the law places upon her to point out wherein the trial court abused the discretion imposed upon it by statute.

(2) The husband proved by the overwhelming weight of the evidence that he was not guilty of any of the charges his wife made against him.

(3) The wife is emotionally unstable and is not mentally endowed with sufficient stamina to face the realities of life.

(4) The wife without cause broke her marriage vows. There is no reason to believe that she would be any more faithful in performing her parental duties.

(5) The wife is now, and will be for sometime to come, financially dependent upon the charity of her mother, or she will seek gainful employment. If she is employed, the care and training of the child in business hours will have to be entrusted to a hireling.

(6) The physical environment which the child will enjoy in the custody of the father will be far superior to anything that the mother or the maternal grandmother will be able to give her.

(7) The laudable desire of a parent to participate in the care, custody, and training of his or her child is the strongest link in the chain that binds a husband and wife together in times of stress, discord, and disagreement. It is a strong incentive which brings about mutual forbearance, concessions, and compromises, that enable the parties to live together and share in the love, affection, and training of the offspring. If the mother knows that, notwithstanding the fact that she has been guilty of breaking the marriage vows, she will be given the custody of infant children, much of the incentive for exercising such forbearance, concessions.

and compromises will be removed. Unfortunately, this will be the result of the conclusion reached by the majority.

As I view the case, the decree of the learned chancellor should be affirmed.

STAPLES, J., dissenting.

I concur in the dissenting opinion of Mr. Chief Justice Hudgins. In addition to the reasons there advanced, I cannot agree with the views expressed in the majority opinion that the love and affection of this young mother for her six year old daughter will necessarily exceed that of the child's paternal grandmother. Common experience frequently has shown the opposite to be true. The grandmother usually has fewer outside interests than a young woman and more often than not a grandchild confided to her care becomes the focus of her love and affection. I think the probabilities are that such will be true in this case. This young, pretty and attractive mother, living at Princeton with its thousands of University students seeking feminine companionship, can hardly be expected to refrain from an active social life. In the ordinary course of nature, she may be expected to aspire to another husband. I think it probable that activities of this kind would greatly impair her ability or willingness to devote that constant attention and care to her daughter which the best interests of the child require.

Furthermore, a University town, with its throngs of young students, is not as suitable an environment for the upbringing of a young girl as the protected home which her grandparents are able and anxious to provide for her in Richmond.

I would affirm the decree of the chancellor.