## Richmond

ANNA M. ISABELLA SCHININA OLIVER v. THURMAN WADE OLIVER
AND OTHERS.

March 10, 1952.

Record No. 3882.

Present, All the Justices.

The opinion states the case.

*Edward Spector* and *Copeland E. Adams,* for the appellant.

*H. H. Watson* and *Fielding L. Wilson,* for the appellees.

SMITH, J., delivered the opinion of the court.

Few cases give us more soul-searching concern than those involving the custody of children. The facts in the instant appeal are complicated and conflicting, but the issue is simple. We are satisfied that the following chronological statement may be accurately and fairly gleaned from the record before us.

In January of 1945, Thurman Wade Oliver, an American citizen and officer in the United States Army, met Anna M. Isabella Schinina, an Italian subject, at a Red Cross dance in Rome, Italy. He was then twenty-eight years old and she was twenty. Anna is the only child of the Marchesa di Sant' Elia, a widow who owned property in Sicily valued at more than one million dollars. Thurman Oliver was born and reared in Crewe, Virginia, of a substantial and highly respected American family.

After a brief courtship, Thurman and Anna were married in Rome on October 22, 1945. While Anna's mother was initially fond of Thurman, she was opposed to her daughter's marrying a foreigner. In any event, the young couple lived with the Marchesa in her home in Rome until April of 1946, when Thurman was returned to the United States for separation from the army. Government regulations did not permit Anna to accompany her husband to this country so she followed him in June of 1946, to Crewe, Virginia, where they set up housekeeping. Five months later they moved to Richmond where Thurman was employed by the A. B. C. Board and Anna, to occupy her time, obtained a position with Thalhimer's department store. They worked and lived in Richmond until August of 1947.

During the time the couple lived in Crewe they had little or no social life as Thurman would be tired from his trip to Richmond and back after working there all day, and in Richmond, although they did go out occasionally, the same situation prevailed. Anna was disappointed and complained that she had no more family life, no more companionship with her husband, than she did, and by "family life" Anna said that she meant a home and the opportunity to see her husband more often and then not always in a tired condition. Anna became homesick so the couple decided to take a vacation and visit her mother in Italy. In August of 1947, Thurman obtained a leave of absence from the A. B. C. Board and they went to the home of Anna's mother in Rome, arriving there in September of 1947.

A few days after arriving in Italy Anna realized that she was pregnant. Thurman stayed until his leave expired in December and returned alone to the United States, as their physician advised Anna not to make the trip at that time because of her condition. Thurman, unable to secure another leave of absence, resigned his position with the A. B. C. Board and in March of 1948, returned to Italy to be with Anna when the baby was born, since she was fearful over her forthcoming delivery and insisted that he be present.

Thurman and his mother-in-law did not get along very well, so shortly after his son Dexter was born on June 15, 1948, the young couple moved to a boarding house in Rome. Thurman's efforts to obtain employment in Rome with the United States government were not successful, so in January of 1949, he again returned alone to this country. An exchange of letters between the husband and the wife indicates that however much they loved each other, Anna felt that the vast difference in their background and station in life was too great a handicap for a successful marriage. In the latter part of February, 1949, Anna cabled Thurman that she would not come back to the United States, that she wanted a divorce, and suggested that he come to Italy and get the child. She expressed a strong desire that Thurman rear their only child in the United States where she believed he would have a better opportunity for success in life. Her wish to have the child reared as an American citizen was so strong that she has always taken particular pains to see that he did not learn to speak the Italian language. The father accordingly went to Rome and Anna gave him the child and he returned with him to his parents' home in Crewe, Virginia. In the spring of 1949, Thurman wrote Anna and pleaded with her to join him in this country and try again to make a success of their marriage for the sake of the child. She agreed to come over and Thurman sent her a ticket for her passage. They lived together with the baby in a rooming house in Warrenton, Virginia, until September of 1949, where the rift between them seemed to increase. Anna didn't like the State of Virginia and thought she would be happier living near New York city, so to please her Thurman obtained a position in Stamford, Connecticut, but the marital relationship by this time had reached a high point of progressive deterioration. Finally, on June 13, 1950, while Thurman was at work, Anna left with the child to go to Nevada to secure

a divorce. Thurman intercepted them at the Washington National Airport, Arlington county, Virginia, took the boy away from Anna, and all three drove to Crewe. The next morning, June 14, 1950, Anna alone departed for Reno, Nevada, where she established her legal residence and subsequently obtained a divorce on December 11, 1950.

Meanwhile, on July 15, 1950, Thurman filed a suit for divorce in the Circuit Court of Nottoway county, Virginia, against Anna on the ground of desertion. The prayer of the bill was for a divorce from bed and board and for custody of the child. Service of the subpoena in chancery was made on Anna in Washoe county, Nevada, on July 17, 1950, by a deputy sheriff of that county. It was returned to and filed in the clerk's office of the trial court on July 20, 1950.

On September 27, 1950, Anna filed her petition in the Circuit Court of Nottoway county, Virginia, naming Thurman and his parents, O. T. Oliver and Irene D. Oliver, as defendants under section 31-15 of the Code of Virginia, 1950, praying custody of the child who was with his paternal grandparents at Crewe, and for counsel fees and the costs of the proceeding.

The trial court, on October 4, 1950, consolidated the prayer for custody in Thurman's bill of complaint and Anna's petition for custody and heard the evidence *ore tenus*. The prayer for a divorce in Thurman's bill of complaint was not considered at that time.

Thurman has since been called back into the armed forces, with the grade of captain, and is now stationed in Richmond, Virginia. Anna is now back in Rome, Italy. The child in living at the home of his paternal grandparents in Crewe, Virginia. This home is a frame house embracing three bedrooms, a living room, dining room, and kitchen, and it is occupied by O. T. Oliver and Irene D. Oliver, the grandparents, their three daughters, and the child Dexter. The child is thus mainly under the care of his paternal grandparents, but the father visits him four nights each week.

In addition to the legal measures already outlined, the wife sought legal advice in Connecticut, New York, and Rome in connection with her desire to get a divorce from her husband. Thurman knew nothing about these negotiations until shortly before Anna left him in Stamford. No useful purpose would be served by beclouding this appeal with their consideration.

Suffice it to say that the trial court in its *ore tenus* hearing had jurisdiction over the child in question, the legal disposition of his custody was the sole issue there involved, and we are here properly concerned only with the correctness of that part of the trial court's final decree to the following effect:

"The Court doth further adjudge, order and decree that the welfare and best interests of said infant child will be promoted by awarding the sole custody of said child, Dexter Edward Maria Oliver, to his father, Thurman Wade Oliver, which is accordingly adjudged, ordered and decreed, with the right of visitation by Anna M. Isabella Schinina Oliver at reasonable times convenient to Thurman Wade Oliver, O. T. Oliver and Irene D. Oliver."

The first question presented for our consideration is a motion by the husband to dismiss this appeal on the ground that the record shows that the wife is not now nor was she on the date this appeal was awarded a party aggrieved.

In support of his motion the husband points to the wife's answer to his divorce bill which answer was filed on February 12, 1951, wherein it is alleged that the wife obtained a divorce on December 11, 1950, in the State of Nevada, dissolving the bonds of matrimony and awarding the custody of the child to her and further alleging that said Nevada decree "is a bar to this proceeding." The record shows that the custody trial here under consideration was held on October 4, 1950, and the decision was rendered on that date, but the decree was not entered until January 22, 1951.

It must be remembered that the divorce suit instituted by the husband wherein he prayed for the custody of the child and the petition of the wife under section 31-15 of the Code were consolidated and heard together as to custody of the infant. Section 31-15 provides: "* * * In such case or in any other case in which the parents are living apart, whether partially or absolutely divorced or not, the court or judge * * * in awarding custody of the child, * * * shall give primary consideration to the welfare of the child, * * *." This language shows that the petition may be filed by parents living apart, whether they be divorced or not.

The husband insisted that the causes be consolidated and heard together, and he does not here concede that the allegation of the wife's answer is binding. Therefore, the wife is a party aggrieved and the husband's motion is dismissed.

By reason of the husband's motion to dismiss, we have been called on to refer to the proceedings in the Nevada case. They are not before us on the issue of custody herein presented, and are beyond the question we are called on to decide.

■ Once the trial court in an *ore tenus* hearing makes findings, this is equivalent to the findings of a jury upon conflicting evidence. The only question which then remains for our consideration is whether the record contains substantial credible evidence which supports the findings of the trial judge. *Nix* v. *Nix,* 186 Va. 14, 41 S. E. (2d) 345.

■ In *Mullen* v. *Mullen,* 188 Va. 259, 49 S. E. (2d) 349, we stated the rule in Virginia that the welfare of the infant is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. All other matters are subordinate. Where the wishes and personal desires of the parents, or either of them, conflict, the welfare of the child is superior and the rights of neither parent take precedence over the rights of the child. In that case, at page 270, we said:

"In considering their qualifications and fitness, we must look to their adaptability to the task of caring for the child; their adaptability to control and direct it; the age, sex, and health of the child; its temporal and moral wellbeing, as well as the environment and circumstances of its *proposed home;* and the influences likely to be exerted upon the child." (Italics supplied).

Following Anna's marriage, she led a fairly nomadic life, living consecutively in Rome, Florence, Crewe, Richmond, Rome, Warrenton, Crewe, Stamford, and Reno; all within a comparatively short period of time, and the evidence shows that most of these moves were made at her insistence. The record also indicates that not only did she not enjoy living in the United States generally, but that she was dissatisfied in particular with those places in which she and her husband had lived, with the positions he obtained, with their station in life, and with their social life. Moreover, it is significant that she made the initial break (which she had been considering since the early part of 1949 while in Rome) when she left her husband on June 13, 1950, with their only child, for the express purpose of establishing her residence in Reno in order to secure a divorce. In any event she is now in Rome.

The trial court in determining the issue of custody was charged with the duty of considering the suitability of the proposed home for the infant child, as was done in the *Mullen Case*. In that case the location, all the surroundings, associations, and companions were made the subject of inquiry. The evidence in the case at bar demanded, in the light of the mother's statements and actions, that several possible homes be considered: Reno, Nevada, where Anna has an apartment; Virginia, where she has no established home; and Rome, Italy, where her only home is with her mother.

An impressive array of witnesses testified that the Olivers' home in Crewe, Virginia, was a fit and suitable place to rear the child, but not one word of testimony was offered in support of the proposed home that Anna had to offer for the care and maintenance of the child.

Anna testified that she went to Reno to establish her legal residence for the purpose of obtaining a divorce and where she now maintains an apartment, but when she was asked whether she liked Reno well enough to remain there she replied, ''Yes, I think so.'' The trial judge might well have concluded that there was no permanency to this home and that it was not really a home. During the trial the wife testified that she was willing to move to Virginia (although she disliked living here and had persuaded her husband to leave), if custody of the child were awarded to her. This was a conditional offer of a home and nothing more.

The testimony, letters, and actions of the wife would have warranted the trial court in inferring that while the wife stated she would live in the United States, she really intended to return to Italy, where she is at this time.

In the *Mullen Case* the wife showed that she had an excellent home in Princeton, N. J., with surroundings suitable and proper in which to rear the child and this court awarded custody of the child to her, a nonresident. In that case both husband and wife were found to be fit custodians and both offered competing homes which were perhaps equally suitable as a home for the child. Here the home that the wife offers is clouded with uncertainty, if in fact it is not totally nonexistent.

These are questions which the trial court had to ponder and after giving appropriate weight to the fact that Anna was a nonresident and had no permanent home, it felt that under present existing conditions the child would have a more secure and

stable home life living in one place with his paternal grandparents, while in the custody of his father. Indeed, in this respect the case is not dissimilar to *Robinette* v. *Robinette,* 153 Va. 342, 149 S. E. 493, where we said, at page 346:

"We think the court erred also in giving the complainant [mother] the custody of the two infant children. They are now living in a comfortable home where they have the advantages of a home and the care and attention of their father, their grandfather and grandmother. If they are awarded to their mother it does not appear from the record that she has any fixed place of abode or any place to rear these minor children. This being true, as heretofore stated, we think the court erred in awarding the custody of these children to their mother."

While it is true that the children in the *Robinette Case* were older than the child involved here and had been living with their paternal grandparents for several years, this does not detract from the weight of the above quotation in its application to this case.

In this case there has been no serious attack upon the character and basic fitness of either parent to have the custody of their child, and both parents were found to be loving and devoted toward the child. Each has some personal traits perhaps undesirable to the other, and their temperaments and desires have clashed at times, but there is nothing inherently objectionable in this regard to either of them having the custody of the child.

 Anna concedes and the evidence amply shows that the home of her parents-in-law is a good one in which to rear the child. He is now in sound and loving hands, and the able and experienced trial judge with full knowledge as to the home and surroundings and after hearing and seeing the witnesses found that the child's welfare demands that he remain where he is. There is substantial credible evidence to support this finding and we are unable to find any reversible error in the decree.

A trial court in dealing with the custody of infants is always open to receive and hear petitions concerning their custody and if conditions change Anna can always petition the trial court for a modification of its decree should such action be warranted.

All the costs of this appeal, including an attorney's fee of $100.00 to counsel for the appellant, are to be taxed against and paid by the appellee, Thurman Wade Oliver.

*Affirmed.*