## Richmond

MARGARET E. FLORANCE v. HENRY A. FLORANCE.

November 28, 1955.

Record No. 4410.

Present, All the Justices.

The opinion states the case.

*Norbert J. Heubusch* and *James A. Danahey*, for the appellant.

*Griffin T. Garnett, Jr.* and *Oren R. Lewis*, for the appellee.

BUCHANAN, J., delivered the opinion of the court.

This appeal involves the custody of James Ferguson Florance, born June 28, 1945, now ten years old, and Robert Henry Florance, born September 27, 1948, and now seven years old. They are the sons of the parties to this suit. By decree of August 10, 1954, the court below awarded their custody to their father, Henry A. Florance, the appellee. Whether that was error is the only question at issue on this appeal by their mother, the appellant.

The suit was brought by the appellant in August 1952, not for divorce but to construe and enforce a separation agreement that had been entered into by the parties on September 19, 1951. That agreement set forth that the parties had married on June 8, 1941, and these two sons were born of the marriage; that disputes and differences had arisen; they had separated and for some time had been living apart, and they desired to settle their property rights and the custody of the children. It was agreed, among other things, that the husband would convey to the wife the home at 405 Shady Lane, in Falls Church, Virginia; pay off a trust against it and pay the wife a stipulated sum. The wife was to have custody of the children, with visiting rights to the husband, and the husband was to pay the wife $435 a month for her and their support and their education, which would be reduced to an equitable amount if the wife re-married or the children were no longer dependent. The contract provided for the release of all other claims by the one against the other and contained various other provisions, including one that the agreement should not constitute a waiver of any right to divorce that either had against the other.

Various pleadings were subsequently filed, including an answer and cross-bill by the defendant on April 15, 1953, which alleged that the complainant had married Ira McKinley and they had gone to Omaha, Nebraska, to live, taking the children with them. He prayed for the custody of the children and for other relief.

On May 12, 1953, a decree was entered directing that Robert should remain in the temporary custody of his father and James in the temporary custody of his mother, then Mrs. McKinley; allowing her money for his support, restraining defendant from molesting her or James, and restraining her from taking Robert out of the court's jurisdiction.

Later complainant filed an answer to the defendant's cross-bill

asking for the custody of both children, and by agreement of the parties a judge *pro tempore* was appointed to hear and decide the case. Code, §§ 17-8 *ff*.

After hearing in open court the testimony of the complainant and her witnesses and of the defendant and his witnesses, on the sole issue, as stipulated by the parties, of the custody of the children, the court entered a decree on October 27, 1953, giving to the complainant the sole custody of James, with an allowance for his support, and giving to the defendant the sole custody of Robert, subject to the right of the complainant to have Robert visit her for five weeks during July and August and the right of the defendant to have James visit him for five weeks during June and July, as specified.

Afterwards, on June 18, 1954, the defendant filed a petition alleging that the complainant had proved unfit to have the custody of James and prayed that his custody be awarded to the defendant. Complainant responded with a petition alleging that the defendant was unfit to have the custody of Robert and prayed that his custody be awarded to her.

At a pretrial conference the issues were agreed on. They included the question of custody of the children as well as certain personal and property rights of the parties. There was included also a stipulation that the income of the defendant was adequate for the maintenance and education of the two children and that it was in excess of $25,000 a year.

It was further stipulated that at the hearing, which was to begin on July 29, 1954, the testimony on the question of custody should be limited to the period since October 27, 1953, the date of the former decree. The court proceeded on July 29 to hear the testimony in open court and concluded the hearing on August 6. Thereafter, on August 10 the decree appealed from was entered deciding the issues submitted and, for reasons stated in a memorandum opinion, the custody of both children was awarded to their father, the defendant; but complainant was given the right of reasonable visitation, on reasonable notice, and the right to have the children with her at reasonable times other than during school terms.

The memorandum opinion states that the court fully considered all the evidence in this cause on the question of custody. That included the evidence which was heard by the court *ore tenus*, together with a deposition, prior to October 27, 1953. We are told

in one of the briefs that that hearing lasted about eight days. That prior evidence is not before us either in the transcript or in the printed record, except the deposition which related to misconduct on the part of the complainant. With that exception the only evidence before us is that heard by the court *ore tenus* beginning July 29 and which makes a volume of approximately five hundred printed pages, much of which is irrelevant to the issues to be decided.

The burden is on the complainant to show the error alleged in the decree of August 10, and unless such error is established by the evidence taken at the July 29 hearing, that decree must stand. 1 Mich. Jur., Appeal and Error, § 259, p. 676. Under the familiar rule, the conclusion of the trial judge, based upon an *ore tenus* hearing of the evidence, is entitled to great weight and on appeal will not be disturbed unless it is plainly wrong or without evidence to support it. *Crump* v. *Gilliam*, 190 Va. 935, 940, 59 S. E. (2d) 72, 74; *Oliver* v. *Oliver*, 193 Va. 571, 576, 69 S. E. (2d) 350, 353; *Brumfield* v. *Brumfield*, 194 Va. 577, 580, 74 S. E. (2d) 170, 172.

The rules to guide and shape decision were clearly stated by Mr. Justice Spratley for the court in *Mullen* v. *Mullen*, 188 Va. 259, 269, 49 S. E. (2d) 349, 354. The welfare of the infant "is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. All other matters are subordinate."

"The rights of neither parent take precedence over the rights of the child. The welfare of the child is superior to the wishes and personal desires of either of them. In considering their qualifications and fitness, we must look to their adaptability to the task of caring for the child; their adaptability to control and direct it; the age, sex, and health of the child; its temporal and moral wellbeing, as well as the environment and circumstances of its proposed home; and the influences likely to be exerted upon the child." 188 Va. at 270, 49 S. E. (2d) at 354.

In its memorandum opinion the court below stated that in its consideration of the evidence it applied these rules and took cognizance of the need of children for those things which proceed from the love of a normal mother, along with the guidance, training and security to be had from the normal relationship of father and son.

That part of the evidence heard by the trial court which is before us shows generally these things:

After the separation agreement of 1951 the relations between this

husband and wife deteriorated and at the time of this hearing, and for sometime prior, a spirit and feeling amounting to malevolence existed between them, arising in minor part from money and jealousy, but in major part over the children. On the part of the husband this manifested itself, among other ways, in spying around the complainant's home at 405 Shady Lane which he had conveyed to her according to the contract. For this she sought unsuccessfully to have him punished for contempt as violating the court's injunction against molesting her. He sought to justify this activity on the ground of finding out first hand the fitness of the complainant to have the children. Much of the testimony is about conversations between them and others by telephone and otherwise of the billingsgate variety, asserted on the one hand and denied on the other.

After the complainant and defendant separated she obtained a divorce from him in Pennsylvania in February 1952, and on April 2, 1953, she married Ira E. McKinley, a lieutenant colonel in the U. S. Army. On December 20, 1952, the defendant married Mrs. Emma Lou Griffin. After the marriage of the complainant and Colonel McKinley they took the children with them to Omaha. The defendant went there and made an effort to bring both boys back but succeeded only in getting possession of Robert. The complainant testified on this hearing that Colonel McKinley obtained a divorce from her in Denver, Colorado, on June 30, 1954, on the ground of abuse and mental cruelty.

Since the marriage of the defendant with Mrs. Griffin their home has been on Glebe Road, in Arlington. The evidence is that it is a large, attractive home, well furnished and well kept, where there is a congenial, wholesome atmosphere. The family consists of Mr. and Mrs. Florance, her two children by a former marriage, and her mother. There Robert has a room of his own and one is available also for James. A number of witnesses testified that the present Mrs. Florance appears to have real love for and interest in Robert, and also in James, to which they seem to respond. She testified in the case and expressed a purpose to assist her husband in every way in the proper care and upbringing of the children. In the course of the hearing complainant's counsel conceded that it was a nice home and "for certain purposes, the custody is okay there. The question on education, we will battle over that." He made no explanation of that reservation. In addition to the home the defendant owns a farm on which there are ponies, boating and other recrea-

tional facilities for the boys in which he supervises them when he takes them there.

At the hearing which resulted in the decree of October 1953 the complainant testified, as admitted by her on the present hearing, that she had married Colonel McKinley and that they intended to maintain a proper home for the children either in Falls Church or wherever the Colonel was assigned in his military duties; but she testified on the present trial that immediately after the former hearing she and Colonel McKinley separated and never lived together as husband and wife after the custody decree of 1953, and they entered into a separation agreement on November 11 following. Thereupon the complainant continued operating the home on Shady Lane as a rooming house, as she had done before her marriage to Colonel McKinley, who was one of her roomers. This was a large house with eight bedrooms on three floors. From nine to fifteen people lived there in somewhat crowded conditions and coming from various walks of life. She testified that she had an income of over $400 a month from roomers, plus $10 a week for doing her mother's laundry and $25 a month from Ted, a son by a marriage previous to her marriage to the defendant. She also did the laundry for her own household. The roomers had kitchen, laundry, living room and television privileges. There was evidence that the house was untidy and poorly kept.

It was into this home and environment that the boys would be brought. It was an environment in which James had been living and there was evidence that it was having a harmful effect on him. It was testified that he did not get proper sleep, stayed up until late hours and ate at irregular times. His teachers testified that he was tardy at school beyond the usual; that at times he seemed very tired, even exhausted, and on at least three occasions had fallen asleep in class; that he was nervous and irritable at times, not well adjusted but emotionally unstable. There was evidence that he was a mixed-up child, a problem child, given to taking things which did not belong to him and which he did not need, and not always truthful. His father testified that James gained weight while with him during the summer, overcame a fear of the water by taking swimming lessons at the country club and became better adapted to playing with other children.

In contrast it was shown that the younger boy, Robert, who has been living in the home of his father for about two years, is well

behaved, well mannered, happy, healthy and well adjusted. He does good work in school and participates well in group activities. A good relationship exists between him and his father and stepmother; he exhibits affection for them both. His teacher testified that he "idolizes his father."

Among the roomers in the home of the complainant was a man named Bridges, several years her junior. The complainant and some of her witnesses, including her father, testified that he was there as a bodyguard for the complainant to shield her from harm from the defendant, and employed for that purpose by her father. There was other evidence indicating a relationship between them not restricted to that employment. She and he both admitted taking a week-end trip to Norfolk together before she was divorced from McKinley, and their explanation of hours of travel and places of staying did not remove all question.

For the purposes of this decision we do not need to sit in judgment on the morals of this mother. It is sufficient to say that the evidence tends to show a nature not always stable and disciplined, and a judgment not always sound. The property conveyed to her as a home for her and the children was soon conveyed by her to her mother, and on the same day conveyed by her mother back to her by a deed never recorded. She said this was done "to fool the public" and relieve her of trouble with defendant's creditors. Her mother later conveyed it to a corporation which conveyed it back to the complainant. She changed lawyers a number of times during the course of this litigation. Her testimony was rambling and included a recital of occurrences that strain credulity. After the court's decision was announced she, together with Bridges, immediately left the jurisdiction of the court, taking with them both children, who were later found in Pittsburgh.

There was evidence on the other hand that the home of the complainant was properly kept and operated; that she was a good mother and a proper person to have custody of the children. The trial court saw and heard the parties and their witnesses and should have been able correctly to resolve such conflicts. *Butler* v. *Butler*, 145 Va. 85, 93, 133 S. E. 756, 759.

The complainant's brief asserts in effect that the defendant is all that he should not be; that he was the cause not only of their trouble, but also of the trouble between her and McKinley, and alludes to incidents in his past as furnishing proof of his unfitness to

have the children. The evidence before us does not support those charges. If such evidence was produced at the former hearing, the judge who made the present decision heard and appraised it. The present evidence is that he is a successful businessman, living in a well-ordered home with proper home life, admittedly appropriate as a home for the children, and affording means and opportunity well above the average for their physical and moral well-being. He is an officer and chairman of the building committee in his church, where he is a regular attendant and where Robert, and also James when in defendant's custody, attend Sunday school and church. He spends as much time as he can with the children, is interested in their play and work, loves them as a father should and maintains a proper amount of discipline. The evidence is substantial that he is a proper person to have the custody and care of his sons.

The evidence shows that the younger boy, Robert, is a healthy, happy and well-balanced boy. That fact is persuasive that he has found in the home of his father the surroundings, atmosphere and treatment that have contributed to, if not brought about, that result. It is reasonably certain that he will be a wholesome and helpful companion for James. The rearing of these two brothers, close to the same age, in the same home, if it is a proper home, with the companionship and associations attendant upon their growing up together, should add measurably to their happiness and to their proper development.

We do not find in this record evidence to warrant a conclusion that the court below was in error in awarding the custody of these children to their father, the defendant, and the decree of August 10, 1954, must be affirmed. The defendant shall pay the costs of this suit in the lower court and in this court and a fee of $400 to complainant's attorneys for services on this appeal.

*Affirmed and remanded.*