## Richmond

J. Dwight Bisel v. Bernice F. Bisel.

January 16, 1956.

Record No. 4447.

Present, All the Justices.

The opinion states the case.

*J. Foster Hagan* and *Frank L. Ball, Sr.*, for the appellant.

*Griffin T. Garnett, Jr.* and *Robert J. Dimond*, for the appellee.

BUCHANAN, J., delivered the opinion of the court.

This is a divorce suit in which we are to decide whether the husband or the wife, or either, is entitled to a divorce and who should have custody of the children, questions which are the bitter fruit of broken marriages.

The court below, after an *ore tenus* hearing, decreed that the wife should have the divorce and custody of one of the three children, with money for their support, and that the husband should have the custody of the other two, one of whom has since married, with visiting rights to both parents. The husband, J. Dwight Bisel, who brought the suit, now appeals and will be referred to herein as plaintiff; and the wife, Bernice F. Bisel, who assigns cross-error, will be referred to as defendant.

The parties were married in Pennsylvania in 1937. In 1940 they bought and moved into a home in Arlington county, which was conveyed to them jointly, and they lived there until their final separation in 1950. Three children were born of the marriage: LaSylda Ann, on March 9, 1938; Linda Jo, on September 10, 1947; and Robert Lee, on August 4, 1949. By the decree appealed from the custody of LaSylda Ann and Robert Lee was given to the plaintiff, and of Linda Jo to the defendant.

The married life of the parties in the home they established soon deteriorated. Fault-finding, quarreling and discontent preceded a separation in 1945, during which the plaintiff instituted suit for divorce against the defendant, but they were later reconciled, the suit was dismissed and they resumed their married life.

The plaintiff instituted the present suit in March 1952, alleging that the defendant deserted him in January 1950, and praying for a divorce *a vinculo* and the custody of the children. The defendant filed her answer and cross-bill alleging that the marriage had been a stormy one, full of cruel treatment by her husband which became so bitter and disagreeable that she was forced to leave their home and go to live with her mother in Baltimore. She prayed for a divorce *a mensa* to be enlarged at the proper time into an absolute divorce, for the custody of the children, money for their support, alimony, attorney's fees and costs.

The plaintiff now contends, first, that the court erred in refusing his prayer for a divorce and granting a divorce to the defendant. He recognizes the rule that the finding of the trial court in an *ore tenus* hearing is equivalent to the finding of a jury on conflicting evidence, and leaves for our consideration only the question of whether there was substantial credible evidence to support the finding. *Oliver* v. *Oliver*, 193 Va. 571, 576, 69 S. E. (2d) 350, 353; *Nix* v. *Nix*, 186 Va. 14, 20, 41 S. E. (2d) 345, 347. He argues that there was no substantial credible evidence to establish the defendant's

claim that the plaintiff was guilty of cruelty which forced her to leave the home and to constitute willful desertion by him for which the court granted her an absolute divorce. See *Denny* v. *Denny*, 118 Va. 79, 86 S. E. 835; *Ringgold* v. *Ringgold*, 128 Va. 485, 104 S. E. 836.

In *Latham* v. *Latham*, 71 Va. (30 Gratt.) 307, often quoted, it was pointed out that there may be cases in which the husband, without either actual or threatened violence, may render the marriage state impossible to be endured, by conduct which may as effectually endanger life or health as physical violence. The *Ringgold* case was held to be a typical one for the application of this exception to the general rule. There the husband, who "considered himself a very pious man," elicited from his wife an admission of some childhood indiscretion, and for that cause he took a separate room and declined to live with her as her husband until some indefinite time when she had, in his opinion, "lived out of her life the sins of her childhood." His other conduct was in keeping with this austere attitude. In holding that the wife was entitled to a divorce on the ground of cruelty and desertion, it was said that violence and apprehension of bodily hurt are not indispensable ingredients of the offense of cruelty; and that mental anguish, repeated and unrelenting neglect and humiliation may be as bad as physical wounds and bruises and amount to cruelty "even in the very strict sense in which that term ought always to be used in the law of divorce."

To establish her charge of cruelty the defendant testified to a series of occurrences and a course of conduct over a period of years on the part of her husband, the cumulative effect as well as the underlying purpose of which she claimed was to drive her away from the home. The main details given by her are these:

In the summer of 1940, the first year in their new home, she was preparing to take their child, LaSylda Ann, to Sunday school and objected when the plaintiff, his brother and the latter's wife tried to take her somewhere else with them. On that occasion he threw her into a chair and beat her.

In February 1945 she was suffering from a thyroid condition, for which she had been under treatment for two years or more, and had just recently been confined to her bed with grippe. Plaintiff told her to be ready and he would take her to a doctor. Instead of doing that, without her knowledge he took LaSylda Ann with him and went to the home of his sister in Pennsylvania and did not come back until June of that year. She later went to the home of his sister who

was keeping the child, and he ordered his sister to put her out, which the latter declined to do. She begged him to come back, and in June they came back together and brought the child with them. It was during that period that he began a suit against her for divorce, but after their reconciliation he dismissed the suit and they began living together again. She had an operation for her thyroid trouble in March 1946 and her second child was born in September 1947.

They soon resumed, however, their quarrels and disagreements, and late in 1949, after the birth of their third child, there came, she said, "a general upheaval." He began telling her she was not acting right; that she was not well. She consulted doctors who tried to re-assure her, but plaintiff continued on the theme, telling her that she would run from people, fear them, not want to be with them. He discouraged her church and social activities and frequently absented himself from home on week-ends. He persisted in telling her she was not mentally right; that he would get control of the family and home, and that she had to get out and go to work. Over a period of weeks from Thanksgiving through Christmas this went on "over and over and over and over again." A day or two after Christmas she called her mother, who came over from Baltimore. During her visit she went with the plaintiff and defendant to see a doctor, who told her mother that he considered it essential that she stay in the home with the defendant, and she did stay for a week or ten days.

The defendant then took the children and went to her mother's in Baltimore, where they stayed for two weeks. On the morning of January 24, 1950, the plaintiff got up early and before the defendant was completely dressed he began on the same theme that she was crazy and saying to her, "You brought the children back. My mother is here. You get out and look after yourself." He then grabbed her by the arm from behind and told her she would have to get out and go to work. Her doctor advised her to go away for several weeks. She went to her mother's in Baltimore and did not come back, she said, "because I wasn't going to be beat up, thrown around and told I was crazy and everything taken away from me without trying to do something to help it one way or the other."

Her mother related incidents of her own visit in corroboration of the defendant, including plaintiff's operation of the furnace to make the house uncomfortable and to frighten them; never speaking to his wife in a kind tone; getting up after midnight and compelling de-fendant to drink coffee with him; asking her at the same time what

plans she was making, and telling the mother, "You are as crazy as she is, and you take your crazy daughter and get out of here."

After this suit was brought Dr. Riesenman, a psychiatrist, was selected by both parties to make an examination of both and report to the court, as referred to later. He testified as a witness for the defendant that he had examined her in May 1952 and again on February 5 and February 21, 1954; that after the 1954 examinations, in connection with which he had talked to her doctors, her mother and a neighbor, he concluded that the plaintiff was not as concerned about his wife as he believed on his examination of him in 1952, and that apparently he had used "threat tactics" against his wife. A neighbor from across the street testified that Mrs. Bisel was a good housekeeper and a good mother and took proper care of her children.

The evidence for the plaintiff was for the most part in direct conflict with that of the defendant in its essential particulars. He did admit the incident she testified to in 1940, but called it merely a spanking, naming the place of its application by a word even less dignified than the act; otherwise the things that had occurred were all the fault of his wife. He took his daughter to his sister's in Pennsylvania in 1945 because the house and the daughter were not properly taken care of. Several months before that time he had had pictures made of the Arlington house in preparation for the divorce suit he brought in 1945, on the grounds of "neglect of the household." He could never get a meal on time. He expected his dinner on the table at six o'clock, although he occasionally came in later than that. The children went to school with dirty clothes. The bed linens were not changed for months at a time. He could never find anything. He never had a clean shirt. He did not order his sister to put his wife out of the house when she came to Pennsylvania to see her child. He never treated his wife cruelly but bent backwards to try to keep a happy household. The arguments they had were one-sided; he only listened. He had never told her she was crazy and he did not force her out of the house when she left in January 1950.

His mother, who came down to live with him when the defendant left in January, testified she had never heard him say a cross word to his wife. The wife of defendant's brother, who had separated from her husband, testified she had never seen the plaintiff mistreat his wife, but the defendant had talked to her about things happening in the home.

The plaintiff's version of the cause and nature of the difficulties

between him and his wife is not too persuasive. At most it created a conflict of evidence which the trial court has resolved in favor of the defendant. The evidence on behalf of the wife is substantial and not incredible. It is sufficient to support the court's decree granting her a divorce.

The plaintiff next contends that the evidence did not warrant the granting of the custody of Linda Jo to the defendant. We think that is true when the evidence is measured by the established rule that the welfare of the child is the paramount consideration and is superior to the wishes and personal desires of its parents. *Mullen* v. *Mullen*, 188 Va. 259, 49 S. E. (2d) 349; *Florance* v. *Florance*, 197 Va. 432, 90 S. E. (2d) 111.

As mentioned above, by agreement of the parties Dr. Riesenman examined them both and gave a written answer to questions specifically directed to him. He said, among other things, that he believed that either parent was capable of properly caring for and rearing the children, but that Mrs. Bisel in 1948 and 1949 was undergoing "a psychotic episode," from which she had now made a complete recovery, and inasmuch as these mental states at times recur, he recommended that Mrs. Bisel be favorably considered for custody of the children "on a probationary status."

The defendant asked for the custody of all three of the children, but a small part of her evidence is devoted to this feature of the case and it does not give the impression that the custody of the children was of first importance to her either in the suit or in the trouble with her husband. The court granted the custody of LaSylda Ann, the oldest child, at her own request, to her father, but she has since married and her custody is not now involved.

The defendant is presently working in a clerical position in Washington and earning $3,110 a year. She is living there in a second-floor apartment, which she rents at $95.50 a month, consisting of a living room, dinette, kitchen, two bedrooms and bath. Asked what provision she would make for caring for the children, she replied, "If I had to work, two of them are in school, I would need some help part-time if not full-time, but I think I could get by with part-time, and I would like to put Robert in the nursery school which is on the corner so that he may be with other children. He will soon be in school himself."

Linda Jo is now eight years old and Robert is six. As we said of a similar situation in *Florance* v. *Florance, supra,* the rearing of these

two children "close to the same age, in the same home, if it is a proper home, with the companionship and associations attendant upon their growing up together, should add measurably to their happiness and to their proper development."

The father's home is the one they have been accustomed to since their birth. The evidence throws no doubt upon his love for them or his ability to take care of them properly. The defendant's own doctor, a specialist in pediatrics who had treated the children in this home, testified as a witness for the plaintiff that the father had given the children good care and they were doing well, and that the grandmother who looked after them was a very nice person and very competent; that while Mrs. Bisel was extremely interested, she was at times highly nervous and seemed to transmit this to the children, who had had fewer illnesses since they had been in the care of their grandmother. The definite impression from his testimony is that the children will be better off in the custody of their father and grandmother where they have been for the last five years. The defendant's neighbor across the street, her own witness, said she knew of no reason why the plaintiff would not be a fit and proper person to have the custody of the children, although she felt that their place was with the defendant.

We conclude that the welfare of these children will be better served by granting the custody of both of them to their father.

The decree appealed from is accordingly affirmed insofar as it grants a divorce to the defendant and directs the plaintiff to pay to her $50 a month for her maintenance and support, and gives to the plaintiff the custody of Robert Lee; but the decree is reversed and set aside to the extent that it grants to defendant the custody of Linda Jo Bisel and directs payment by the plaintiff of $60 a month for her maintenance and support. The custody of Linda Jo is awarded to the plaintiff; but the defendant shall have the right to visit both children on the terms provided in said decree as to Robert Lee; that is, at all reasonable times and places and to have them with her at such reasonable times and places as will not interfere with their education or health, including the right to have them with her for a period of six weeks during the school vacation months in the summer.

The plaintiff shall pay the costs of this appeal together with an additional sum of $200 to defendant's counsel for his attorney's fee in this court.

The cause is remanded to the court below with direction to enter

a decree to provide as herein decided and to enter such subsequent decrees from time to time for the custody, care and maintenance of the children and as to the payment of alimony to the defendant as the circumstances may make proper.

*Affirmed in part, reversed in part, and remanded.*